**In re Carl SCARAFIOTTI, Pamela Jean Scarafiotti, Debtors.**

**No. 06–11402 EEB.**

United States Bankruptcy Court, D. Colorado.

Sept. 7, 2007.

Anthony R. Cross, John Turner, Colorado Springs, CO, for Debtors.

## ORDER

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on the Motion to Dismiss Chapter 7 Case Under 11 U.S.C. § 707(b)(1), filed by the United States Trustee ("**Trustee**"), and the Debtors' Response. The disputed issues in this case center around the proper application of the "Means Test" under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("**BAPC-PA**"). In particular, it raises the questions of whether the Debtors may deduct (1) the ownership expense allowance specified in the IRS Local Transportation Standards for two vehicles they own free and clear; (2) a housing expense greater than the amount provided for under the IRS Local Housing Standards; and (3) Thrift Savings Plan contribution and loan repayment amounts deducted from their bi-monthly paychecks.

## I. FACTUAL BACKGROUND

The Debtors filed their Chapter 7 petition on March 31, 2006. As required by BAPCPA, the Debtors timely filed form B22A, the "Statement of Current Monthly Income and Means Test Calculation" ("**Form B22A**"),[1] checking the box to indicate that the presumption of abuse under 11 U.S.C. § 707(b)(1)[2] did not arise in

their case. On subsequent review, the Trustee concluded the opposite, namely that the Debtors' case should in fact be presumed to be an abuse under § 707(b)(1). The parties agree that the Debtors' Current Monthly Income ("**CMI**") of $5,577.44, exceeds the median income for a family of three in Colorado.[3] They differ on whether three of the Debtors' claimed expenses are allowable under the Means Test, and/or whether special circumstances exist to allow the claimed expenses.

### A. Vehicle Ownership Allowance

The Debtors own two vehicles, a 1988 Chevy Blazer and a 1993 Plymouth Acclaim. The Acclaim has over 190,000 miles on it; the Blazer has over 300,000. Neither car is encumbered by a lease or loan payment obligation. Despite this fact, the Debtors have claimed a vehicle ownership expense of $803.

### B. Housing Allowance

The IRS Local Standard for housing for a family of three, living in Pueblo County, Colorado, is $1,084. This figure represents a combined allowance for both housing and utilities. The Debtors' utility expense is $331 per month. Their monthly rental payment is $1,050.[4] Thus, their

---

1. This form was implemented to aid debtors in completing information required by § 707(b), and is mandated for certain Chapter 7 debtors under § 707(b)(2)(C) and Interim Bankruptcy Rule 1007(b)(4).

2. Subsequent statutory references are to the Bankruptcy Code ("Code"), 11 U.S.C. § 101, *et seq.*, unless otherwise noted.

3. The median income figures are provided by the Census Bureau, and calculated based on State and family size. These figures are updated each year, and thus may change depending on the particular petition date. For cases filed between February 13, 2006 and

September 30, 2006, the median income for a family of three in Colorado is $60,550. *See* U.S. Trustee Program, Census Bureau Median Family Income by Family Size, *available at* http://www.usdoj.gov/ust/eo/ bapc-pa/20060213/bci_data/median_income_table.htm (last visited Sept. 6, 2007). On their petition date, the Debtors' income, when multiplied by twelve, was $66,929.28.

4. Pretrial, the parties stipulated to the amount of the lease payment in the Joint Statement. As a result, the Debtor did not offer any documentary evidence to support the claimed expense. The Court, however, required the Debtors to provide supporting documentation

combined figure for housing and utilities exceeds the Local Standard by $297. The Debtors claim that their special circumstances warrant an increase in the housing allowance.

Subtracting the $331 utility figure from the Local Standard for both housing and utilities of $1,084 would leave the Debtors with only $753 for a rental payment. According to the Debtors, they cannot rent a suitable home for $753 or less per month. Presently, the Debtors reside in Pueblo West, Colorado, with their 10 year-old son, in a ranch-style home, with three bedrooms, two baths, and a two-car garage. The Debtors had previously owned a home, but lost it in foreclosure. Soon after, they began searching for a suitable rental home in Pueblo West, utilizing the services of Coldwell Banker. They discovered that rental units were available in Pueblo County in the price range of approximately $750, but they were located in unsuitable and potentially unsafe neighborhoods. Mrs. Scarafiotti also testified, without objection, that the Coldwell Banker representative had informed them that a reasonable rental unit for a family of three would cost approximately $925 in the Pueblo County market. They were able to locate a few 2–bedroom homes which were available for approximately $900 per month, but these homes were located far away from where the Debtor's son attends school. After searching for approximately three months, the Debtors settled on their present home.

The Debtor's son is currently seeing a child psychologist each month for mental and emotional difficulties. He previously attended an elementary school in Pueblo West, where he was bullied by his classmates and maintained a poor grade point average. His parents then transferred him to Swallows Charter Academy, also in Pueblo West. His grades improved dramatically and he is well-received by his classmates. In order for him to attend Swallows Charter Academy, the Debtors only have to reside somewhere within Pueblo County. However, Mrs. Scarafiotti testified that their child psychologist strongly recommended that their son needed to live in a neighborhood where he could interact with other children from his school. The location of their present home fills this need. The Trustee did not dispute these assertions, but countered that the Debtors could move to El Paso County, where both Debtors work, and where cheaper housing is available. The Debtors have never considered moving to El Paso County, despite a commute of over 100 miles per day to and from work, because they need the after-school child care assistance of their extended family, which is only available in Pueblo.

## C. Retirement Plan Contributions and Loan Repayments

Finally, the Trustee disputes the Debtors' ability to deduct their monthly retirement plan contributions and loan repayments. Both Debtors participate in a Thrift Savings Plan ("TSP") through their respective employers. They have previously taken withdrawals from their retirement plans to pay bills, and have agreed to automatic payroll deductions from their biweekly checks to repay the withdrawals. Mrs. Scarafiotti contributes $150.76 per month to her TSP, and has $201.48 per month taken out for TSP repayments. Mr. Scarafiotti contributes $115.53 per

post-trial in order to satisfy the documentation requirement of § 707(b)(2)(B)(ii), while preserving the Trustee's right to object. *See discussion, infra.* The Debtors complied and, since the Trustee did not object, the Court admitted the documentation into evidence post-trial.

month to his TSP, and has $42.79 taken out for repayments.

## II. DISCUSSION

### A. General Background on the Means Test

#### 1. Purpose and Scope of Means Testing

Prior to the enactment of BAPCPA, debtors enjoyed a presumptive right to a Chapter 7 discharge.[5] Congress, perceiving that many debtors who filed under Chapter 7 might have the ability to repay portions of their debts if forced into Chapter 13 plans, constructed a statutory test which certain debtors must overcome before they are allowed to proceed under Chapter 7.[6] This is the so-called "Means Test" contained in the current version of § 707(b)(2). The Means Test essentially serves as a vehicle to determine how much disposable income a debtor will have each month, after the deduction of allowable expenses. The remaining income is multiplied by sixty. If the product is greater than a given amount, the presumption of abuse arises,[7] and the debtor must show special circumstances sufficient to rebut the presumption, in order to avoid involuntary dismissal. Alternatively, the debtor may avoid dismissal by voluntarily converting to a Chapter 13 case.

The Means Test only applies when three conditions are present: (1) the debtors are individuals; (2) the debtor's CMI, multiplied by 12, is above the median income of the state in which the debtor resides; and (3) the debtor's debts are primarily consumer debts.[8] The parties do not dispute the presence of all three conditions in this case.

#### 2. National & Local Standards, Other Necessary Expenses

The Means Test limits a debtor's claimed monthly expenses to standards that have been enacted by the IRS.[9] These standards, found in the Internal Revenue Service's Financial Analysis Handbook, were originally adopted by the IRS for the purpose of calculating a taxpayer's ability to repay delinquent tax amounts.[10] The

---

**5.** *See* 11 U.S.C.A. § 707(b) (West 2002).

**6.** *See* H.R. Rep. 109–31 at 12 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 99 ("Over the course of its hearings since the 105th Congress, the Committee received testimony explaining that if needs-based reforms and other measures were implemented, the rate of repayment to creditors would increase as more debtors were shifted into chapter 13 . . . as opposed to chapter 7 . . . .").

**7.** Under the statute, the presumption of abuse can arise in two situations: (1) if the debtor's CMI, when reduced by allowable expenses and multiplied by sixty, is greater than $10,000, or (2) if the same number is greater than $6,000 and would be sufficient to pay at least 25 percent of the debtor's nonpriority unsecured debt. 11 U.S.C. § 707(b)(2)(A)(i)(I) and (II). *See also* Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr.L.J. 231, 241–42 (2005).

**8.** No party, including the court, may file a motion under § 707(b)(1) unless the product of debtor's CMI, when multiplied by 12, is above the median income level for a family of similar size in the debtor's State of residence. 11 U.S.C. § 707(b)(7)(A). Once this threshold has been met, a motion may only be filed if the debtor has primarily consumer debts. *Id.* § 707(b)(1).

**9.** *See* Wedoff at 252–53.

**10.** *Id.* The legislative history accompanying BAPCPA specifically references the Financial Analysis Handbook as the source of the applicable expenditure amounts under the statute. *See* H.R. Rep. 109–31, at 13–14 (2005) (footnotes omitted), *reprinted in* 2005 U.S.C.C.A.N. 88, 99–100 ("In addition to other specified expenses, the debtor's monthly expenses-exclusive of any payments for debts (unless otherwise permitted)-must be the applicable monthly amounts set forth in the Internal

Financial Analysis Handbook is a subpart of the larger Internal Revenue Manual ("**IRM**"), which "contains the policies, procedures, instructions, guidelines, and delegations of authority which direct the operation and administration of the Internal Revenue Service." [11]

The **National Standards** set fixed amounts for five categories of expenses: (1) food; (2) housekeeping supplies; (3) apparel and services; (4) personal care products and services; and (5) miscellaneous expenses. These expense amounts are uniform throughout the contiguous United States and are based on the Bureau of Labor Statistics ("**BLS**") Consumer Expenditure Survey.[12] The expenses vary

based only on the taxpayer's gross monthly income and household size.[13]

The **Local Standards** address only two expenses: transportation and housing/utilities.[14] The transportation portion is further divided into two sub-parts: a nationwide allowance for vehicle ownership expense, and an operating or public transportation expense. The housing/utilities standards are derived from BLS and U.S. Census Bureau data, and vary by county of residence within a given State. The amounts allowed for the National and Local Standards are published only on the Internet, accessible through the IRS website.[15]

Revenue Service Financial Analysis Handbook as Necessary Expenses under the National and Local Standards categories and the debtor's actual monthly expenditures for items categorized as Other Necessary Expenses.").

**11.** Internal Revenue Service, *Information Quality Guidelines—Guidance: Information in the Internal Revenue Manual (IRM)*, *available at* http://www.irs.gov/irs/article/0,,id=131183,00.html (last visited Sept 6, 2007).

**12.** Alaska and Hawaii have higher expense amounts due to an increased cost of living in those states. The amounts specified for "miscellaneous expenses" are set by the IRS, not the BLS.

**13.** The National Standards are available at http://www.irs.gov/businesses/small/article/0,,id=104627,00.html (last visited Sept. 6, 2007).

**14.** The Local Standards for each of the categories can be accessed at http://www.irs.gov/individuals/article/0,,id=96543,00.html (last visited Sept. 6, 2007).

**15.** To locate these amounts, a debtor must first access the Financial Analysis Handbook, located within the IRM, selecting "Part 5: Collecting Process," and then "Part 5.15.1: Financial Analysis Handbook." At Exhibit 5.15.1–2, the site provides instructions for online access to the expense tables referenced

within the Financial Analysis Handbook. The instructions provide as follows:

The Allowable Expense Tables (Collection Expense Standards) are web-based and are located on the following URL:
Internet access: http://www.irs.gov/
Complete the following steps for internet access:
1. Enter http://www.irs.gov/ for access to the IRS Digital Daily page
2. Next, under Contents click on Individuals.
3. Click on Collection Financial Standards.

Instructions *available at* http://www.irs.gov/irm/part5/ch15s01.html# d0e182991 (last visited Sept. 6, 2007). However, for each expense category under the National and Local Standards, upon accessing the particular page devoted to an expense item, bankruptcy filers and practitioners are instructed not to use the IRS figures for bankruptcy calculations, and to proceed to the United States Trustee Program website, wherein they are able to access separate tables to be used for the purposes of bankruptcy calculations. *See also In re Wilson*, 356 B.R. 114, 120 (Bankr. D.Del.2006). The applicable amounts under the National and Local Standards vary depending on the petition date in a given case, *see* 11 U.S.C. § 707(b)(2)(A)(ii), and the UST Program's website reflects this by requiring users to select an applicable time period before gaining access to the expense tables.

**Other Necessary Expenses** refer to the IRM's listing of numerous other categories of expenses that are not covered by the National or Local Standards.[16] The list is non-exclusive, but it does not extend to include, or overlap with, the categories already provided for in the National and Local Standards.[17] The IRM does not provide any fixed allowances for the Other Necessary Expenses.

### 4. Special Circumstances

Once the debtor's monthly expenses are calculated in accordance with the Means Test provisions, a statutory formula determines whether the case should be presumed to be an abuse of the provisions of Chapter 7. If the presumption of abuse arises, the debtor may only rebut the presumption by proving "special circumstances" that would justify additional monthly expense amounts. The statute sets forth four prerequisites to claiming "special circumstances." The debtor must (1) itemize each additional expense;[18] (2) provide documentation for the expense;[19] (3) give a detailed explanation that demonstrates that the expense is necessary and reasonable;[20] and (4) demonstrate that there is no reasonable alternative other than to allow the additional expense.[21]

### B. Vehicle Ownership Allowance

■ The first question before the Court is whether § 707(b)(2)(A) allows a debtor to deduct a vehicle ownership expense for a vehicle owned free and clear of any lease or loan payment obligations. In determining allowable expenses, the statute provides:

> [t]he debtor's monthly expenses shall be the debtor's *applicable* monthly expense amounts specified under the National Standards and Local Standards and the debtor's *actual* monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case....

11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). The italicized language in this statute gives rise to the present controversy. Are these Debtors entitled to deduct the *applicable* standardized amount for car ownership, when they owe no *actual* lease or loan payments on their cars, or are they only able to deduct their actual costs of ownership? In order to answer this question, we must interpret the statute's use of "applicable" instead of "actual" in its reference to the Local Standards that establish car allowances. Courts are split on their interpretation of "applicable" in § 707(b)(2)(A)(ii)(I).

In one line of cases, courts interpret the word "applicable" to mean that the ownership expense *category* is only "applicable" to the debtor if an expense is actually incurred in a given month.[22] We refer to these decisions as the **"IRM View,"** because they base their interpretation on the IRM.[23] "Because the Local Standards are

---

**16.** *Wedoff* at 261.

**17.** *Id.*

**18.** 11 U.S.C. § 707(b)(2)(B)(ii).

**19.** *Id.* § 707(b)(2)(B)(ii)(I).

**20.** *Id.* § 707(b)(2)(B)(ii)(II).

**21.** *Id.* § 707(b)(2)(B)(i).

**22.** *See e.g., In re McGuire,* 342 B.R. 608, 613 (Bankr.W.D.Mo.2006).

**23.** Courts adopting the IRM View include *In re Hardacre,* 338 B.R. 718 (Bankr.N.D.Tex. 2006); *In re McGuire,* 342 B.R. 608 (Bankr. W.D.Mo.2006); *In re Lara,* 347 B.R. 198 (Bankr.N.D.Tex.2006); *In re Oliver,* 350 B.R. 294 (Bankr.W.D.Tex.2006); *In re Harris,* 353 B.R. 304 (Bankr.E.D.Okla.2006); *In re Slush-*

issued by the Internal Revenue Service, it is instructive to refer to publications of that organization for guidance as to the types of 'debt payments' that can reduce allowances under the Local Standards." [24] The IRM makes clear that " '[t]he taxpayer is allowed the local standard or the amount actually paid, whichever is less.' " [25] Thus, under the IRM, the Local Standard serves as a cap or ceiling on the amount of an actual expense. In regard to car allowances, the IRM expressly provides that, "[i]f the taxpayer has no car payment, or no car, question how the taxpayer travels to and from work, grocer, medical care, etc. The taxpayer is only allowed the operating cost or the cost of transportation." [26] According to the IRM View, these and other provisions of the IRM should be consulted when deciding the amounts allocable under the National and Local Standards because "it makes no sense to turn a blind eye to existing administrative interpretations of the very text Congress has specified." [27]

In another line of decisions, which we refer to as the **"Plain Language View,"** courts have held that "applicable" refers to the amount listed on a table of Local Standards, which varies only based on a given locale and number of vehicles owned. Whatever this standard amount is, it "applies," regardless of whether the debtor has an actual expense associated with the lease or purchase of a vehicle.[28]

> [W]hat makes an ownership expense "applicable" is not whether the debtor is required to make a car payment or whether the deduction would be allowed by the IRS. Rather, whether an expense is "applicable" depends on the number of vehicles owned or leased by the debtor. Further ... the term "applicable" modifies the phrase "monthly expense amounts specified under the National Standards and Local Standards." With the exception of the ownership expense, all other Local Standards vary depending on where the debtor resides. Thus, where a debtor resides [also] dictates which Local Standards are "applicable." [29]

In addition, the "applicable" amounts can only be found on the tables for the Local Standards. They are not listed within the IRM.[30]

---

*er*, 359 B.R. 290 (Bankr.D.Nev. Jan.17, 2007); *In re Ceasar*, 364 B.R. 257 (Bankr.W.D.La. Mar.6, 2007); *In re Talmadge*, 2007 WL 1941807, 2007 Bankr.LEXIS 2237 (Bankr. M.D.Pa. June 28, 2007); *In re Cole*, 2007 WL 1953126, 2007 Bankr.LEXIS 2258 (Bankr. W.D.Wash. July 3, 2007). Some of these decisions involve Chapter 13 debtors. However, for above-median income debtors, §§ 707(b)(2)(A) and (B) apply equally to determine necessary expenses under Chapters 7 and 13. *See* 11 U.S.C. § 1325(b)(3).

**24.** *Hardacre* at 726.

**25.** *In re Fowler*, 349 B.R. 414, 417 (Bankr. D.Del.2006) (quoting IRM § 5.15.1.7 ¶ 4).

**26.** IRM § 5.15.1.9, Note.

**27.** *In re Slusher*, 359 B.R. at 309.

**28.** Courts adopting the Plain Language View include *In re Fowler*, 349 B.R. 414 (Bankr. D.Del.2006); *In re Haley*, 354 B.R. 340 (Bankr.D.N.H.2006); *In re Grunert*, 353 B.R. 591 (Bankr.E.D.Wis.2006); *In re Prince*, 2006 WL 3501281, 2006 Bankr.Lexis 3404 (Bankr. M.D.N.C. Nov. 30, 2006); *In re Wilson*, 356 B.R. 114 (Bankr.D.Del.2006); *In re Zak*, 361 B.R. 481 (Bankr.N.D.Ohio Jan. 12, 2007); *In re Sawdy*, 362 B.R. 898 (Bankr.E.D.Wis. 2007); *In re Ragle*, 2007 WL 1119632, 2007 Bankr.Lexis 874 (Bankr.E.D.Ky. Mar. 23, 2007).

**29.** *In re Haley* at 343–44.

**30.** Wedoff at 254. *See In re Prince*, 2006 WL 3501281 at *2–3, 2006 Bankr.Lexis 3404 at *9 ("The tables that constitute the Local Standards contain no reference to monthly loan or lease payments and do not condition the stan-

At first blush, the IRM View appears to offer the most sound interpretation of "applicable" in this context. The references in the statute to the National and Local Standards and Other Necessary Expenses are to terms defined by the Internal Revenue Service. The IRM itself has a clear answer as to when the vehicle ownership allowance may be used. But this Court rejects any interpretation of the statute that would derive its meaning from the IRM. Instead we adopt the Plain Language View. It alone gives effect to all of the language employed in the statute. And it conforms to the purposes and intent of the statute.

■■■■ Any interpretation of the statute must begin with the language of the statute itself.[31] In the Means Test, Congress employed the word "applicable" in reference to the National and Local Standards. It used "actual" to refer to the Other Necessary Expenses. "It is well settled that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' "[32] Here the difference in terminology appears in the same sentence. Thus, we must presume that Congress used "applicable" to mean something other than "actual."[33] Certainly, it knew how to say "actual" when it meant to refer to "actual" expenses. And

a court should attempt to construe a statutory provision, if possible, so as to give effect to every clause and word in the statute.[34]

Congress could easily have employed the same language as the IRM, in referring to the National and Local Standards as a cap. It could have used language such as "the debtor's monthly expense shall be the debtor's applicable monthly expense amount specified under the National Standards and Local Standards, or the amount actually paid, whichever is less." The fact that it did not use similar language indicates it did not intend to apply the Local Standards as a cap.

Nor does the statute expressly refer to the IRM. The legislative history indicates that a prior draft version of BAPCPA expressly referred to the IRM in defining "projected monthly net income" as:

the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance (excluding payments for debts) for the debtor ... in the area in which the debtor resides *as determined under the Internal Revenue Service financial analysis* for expenses in effect as of the date of the order for relief.[35]

Congress omitted this reference to the IRM's Financial Analysis Handbook in its final passage of BAPCPA. Thus, if Congress had intended to incorporate the

---

dard ownership allowances upon the existence of such payments.").

**31.** *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1178 (10th Cir.2002). The best indication of Congress' intent can ordinarily be found in the words utilized in any given statute. *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

**32.** *Duncan v. Walker* at 173, 121 S.Ct. 2120 (citations omitted).

**33.** *See e.g., In re Fowler* at 418; *In re Wilson* at 118.

**34.** *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *Duncan. v. Walker* at 174, 121 S.Ct. 2120.

**35.** *In re Fowler* at 419 (quoting H.R. 3150, 105th Congress (1998) (emphasis added)).

IRM, it would have referred to it expressly.[36]

■ More importantly, statutory provisions should not be read in a vacuum, but must be construed in light of the entire statute.[37] Language employed elsewhere in this same subsection demonstrates that Congress did not intend to rely on the IRM because the statute includes provisions and language that would have been unnecessary if it had incorporated the IRM. Other portions of the Means Test refer to additional categories of allowed expenses, which include:

(1) *reasonably necessary* expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence ... ;[38] (2) if it is demonstrated that it is *reasonable and necessary*, ... an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards ... ;[39] (3) if applicable, the continuation of actual expenses paid by the debtor that are *reasonable and necessary* for care and support of an elderly, chronically ill, or disabled household member ... ;[40] (4) the actual expenses for each dependent child ... to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are *reasonable and necessary,* and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses ... ;[41] and (5) an allowance for housing and utilities, in excess of the allowance specified by the Local Standards ... , based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are *reasonable and necessary.*[42]

If Congress had intended to incorporate the IRM's interpretations into this statute it would not have needed to expressly limit

---

**36.** *See, e.g., Russello v. United States,* 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."). *See also In re Fowler* at 419 ("The change from the prior version ... lends credence to the Court's conclusion that it should look only to the amounts set forth in the Local Standards. *See, e.g., Transcontinental & Western Air, Inc. v. Civil Aeronautics Bd.,* 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949) (relying on legislative history to prior unenacted bill for clarification of language used in bill that was ultimately enacted))."

We recognize, however, that the House Report accompanying BAPCPA states that:
[i]n addition to other specified expenses, the debtor's monthly expenses—exclusive of any payments for debts (unless otherwise permitted)—must be the applicable monthly amounts set forth in the Internal Revenue Service Financial Analysis Handbook as Necessary Expenses under the National and Local Standards categories and the debtor's actual monthly expenditures for items categorized as Other Necessary Expenses.
H.R.Rep. No. 109–31 at 13–14 (footnotes omitted). The best explanation for this excerpt from the House Report is that it merely tells the reader where to locate the applicable amounts under the National and Local Standards. *See In re Wilson* at 120.

**37.** *See United States v. Am. Trucking Ass'ns,* 310 U.S. at 542, 60 S.Ct. 1059 ("To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute. ...").

**38.** *Id.* § 707(b)(2)(A)(ii)(I) (emphasis added).

**39.** *Id.* (emphasis added).

**40.** *Id.* § 707(b)(2)(A)(ii)(II) (emphasis added).

**41.** *Id.* § 707(b)(2)(A)(ii)(IV) (emphasis added).

**42.** *Id.* § 707(b)(2)(A)(ii)(V) (emphasis added).

the additional expenses to what is "reasonable and necessary."

The IRM already contains a "reasonable and necessary" requirement:

> Allowable expenses include those expenses that meet the necessary expense test. The necessary expense test is defined as expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income. The expenses must be reasonable. The total necessary expenses establish the minimum a taxpayer and family needs to live.[43]

The IRM goes on to indicate that the three types of necessary expenses include the National Standards, Local Standards, and Other Expenses.[44] Under the IRM, taxpayers may claim amounts in excess of any stated amount under the National and Local Standards. One provision states that "[n]ational local expense standards are guidelines. If it is determined a standard amount is inadequate to provide for a specific taxpayer's basic living expenses, allow a deviation. Require the taxpayer to provide reasonable substantiation and document the case file."[45] Another provision provides that "[a] taxpayer that claims more than the total allowed by the national standards must substantiate and justify each separate expense of the total national standards amount."[46] In regard to housing expenditures, the IRM states that "[a]ny other housing expenses should be allowed only if, based on a taxpayer's individual facts and circumstances, disallowance will cause the taxpayer economic hardship."[47]

If we were to graft the IRM into the Means Test, we would render the "reasonable and necessary" language in the statute mere surplusage. There would have also been no need for Congress to specify in § 707(b)(2)(A)(ii)(I) that debtors are allowed up to a 5 percent increase in the food and clothing categories under the National Standards, or that debtors are allowed an excess expenditure under § 707(b)(2)(A)(ii)(V) for housing and utilities based on their home energy costs. The IRM would already have provided the means for increasing these allowances. And debtors could make adjustments to virtually any other category of expense simply by reference to these IRM provisions. In fact, some courts adhering to the IRM View have essentially done this, replacing § 707(b)(2)(A)(ii) with the IRM's provisions.[48]

---

43. IRM § 5.15.1.7(1).

44. *Id.* § 5.15.1.7(2).

45. IRM § 5.15.1.7(7).

46. IRM § 5.15.1.8(3).

47. IRM § 5.15.1.9(1)(A).

48. *In re Renicker,* 342 B.R. 304, 311 (Bankr. W.D.Mo.2006) ("[U]nder the I.R.S. standards incorporated into § 707(b)(2)(A)(i), telecommunication expenses can be included ... if they are necessary and reasonable."). Another court utilized the IRM to allow an additional vehicle operating expense to a debtor under the Local Standards. *In re Oliver,* 350 B.R. at 302. The debtor in that case drove approximately 3,000 miles per month, and claimed $358 per month in addition to the amounts specified under the Local Standards. *Id.* The court, invoking the provisions of the IRM, found that the debtor's additional expenses were "necessary" and therefore allowable under the IRM. *Id.* The debtor in that case neither specifically itemized this additional expense nor provided any documentation. *Id.* However, the court found that "the Debtor's working conditions and his knowledge with respect to miles driven per month suggests that this expense is accurate." *Id.* But in another case considering this additional operating expense, the court required the debtors to show not just that the expenses were "necessary," but that they constituted "special circumstances." *In re Batzkiel,* 349 B.R. 581, 586 (Bankr.N.D.Iowa 2006).

Incorporating the IRM into the Means Test would also render the requirements of § 707(b)(2)(B) a nullity. The statute does not allow augmentation of expenses if they are merely "inadequate" or would create an "economic hardship" for the debtor. The statute says they may be increased only if there is "no reasonable alternative," and only after a demonstration of "special circumstances" in the specific manner prescribed by this statute.

■ The Plain Language View is in keeping with the overall purposes of BAPCPA. As the bill's title reveals, this act was intended to curb what were perceived as abusive bankruptcy practices.[49] Congress wanted to ensure that debtors who have the ability to repay a portion of their debts be forced to do so through Chapter 13.[50] It wanted to eliminate the broad discrepancies in court decisions interpreting "substantial abuse" under the prior version of § 707(b).[51] To do this, they enacted the Means Test, which was intended to impose a "rigid and inflexible" set of expense standards.[52] The Plain

Language View conforms with these purposes. All debtors would be subject to a rigid set of standards, reflected in the National and Local Standards. Judges would not be permitted to consider hardship on a debtor, unless the debtor could establish special circumstances in the manner required by § 707(b)(2)(B).

Furthermore, allowing a vehicle ownership expense when the debtor owns the vehicle free and clear is not demonstrably at odds with the statute's intent. It does not necessarily distort the debtor's ability to repay creditors under a Chapter 13 plan. This allowance merely reflects the reality that debtors who own their vehicles outright will typically have older vehicles that will require numerous repairs and/or will soon need to be replaced, likely in the course of a five-year plan.[53] Arguably, the hypothetical Chapter 13 debtor would be allowed to include an appropriate savings amount to plan for this contingency, or would be allowed to amend their Chapter 13 plan to account for this need.[54]

---

49.  See In re Hardacre, 338 B.R. at 720.

50.  See Id. at 725;  see also Statement by President George W. Bush Upon Signing S. 256, reprinted in 2005 U.S.C.C.A.N. S7 (Apr. 20, 2005).

51.  See H.R. Rep. 109–31 at 12 ("The standard for dismissal—substantial abuse—is inherently vague, which has lead to its disparate interpretation and application by the bankruptcy bench.").

52.  145 Cong. Rec. H2718 (daily ed.  May 5, 1999) (statement of Chairman Hyde);  see also Statement of Administration Policy, Executive Office of the President (May 5, 1999), available at http://clinton2.nara.gov/OMB/legislative/sap/HR833–h.html (last visited Sept. 6, 2007) ("H.R. 833 in its current form would limit access to Chapter 7 to debtors who meet an inflexible and arbitrary means test.... H.R. 833 simply takes IRS expense standards, which were not developed for bankruptcy purposes, and applies them rigid-

ly to determine ability to repay in bankruptcy.").

53.  Wedoff at 257.

54.  See In re McGuire, 342 B.R. at 614 & n. 22. The McGuire court specifically addressed this argument in the context of a Chapter 13 plan. The court found that, although the debtors were not entitled to claim an ownership expense as they had no actual loan or lease payments on their vehicle, they would be allowed to amend their plan in the future if a replacement vehicle was required. The court noted that § 521(f)(4)(B), as amended by BAPCPA, requires debtors, on a motion by the court or a party in interest, to file annual updates regarding their income and expenditures. The court concluded that this provision must necessarily allow for debtors to amend their plans in the future, or else it would serve no purpose.

■ Finally, to the extent that the rigid expense standards imposed by the Means Test allow a debtor to abuse the system, Congress has provided a fail-safe mechanism to curb abuse. Even after allowable expenses are calculated, and the presumption of abuse is rebutted or simply does not arise, the Court must still consider whether a petition has been filed in bad faith, or whether the totality of the circumstances warrants dismissal for abuse, as required by 11 U.S.C. § 707(b)(3). In fact, "[t]he UST can argue, and the Court can consider, the fact that the Debtor does not have any secured car debt to pay in determining whether the case should be dismissed under § 707(b)(3)." [55] Based on the foregoing, the Debtors will be allowed to deduct the full ownership allowance for their two vehicles.

## C. Housing Allowance

■ The Debtors monthly rental payment is $297 over the amount that would otherwise be allowed under the Local Standards.[56] The Trustee asserts that the Debtors have failed to demonstrate "special circumstances" as required by the statute.[57] The pertinent language in § 707(b) states:

In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

11 U.S.C. § 707(b)(2)(B)(i). This provision requires that a debtor demonstrate that his circumstances are "special" and that there is "no reasonable alternative." The Debtors assert that the modest increase in housing expense, incurred as a result of their son's special needs, fits these criteria.

■ The Trustee argues that the Debtors' circumstances are not "special" because they do not rise to the same level of exigency as the examples set forth in the statute. The Trustee urges the Court to employ the canon of *ejusdem generis*, which provides that " 'where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " [58] Because this

---

55. *In re Fowler*, 349 B.R. at 421; *see also In re Pak*, 343 B.R. 239, 244 (Bankr.N.D.Cal. 2006) (holding that debtor's actual ability to repay nonpriority unsecured debts may be considered as part of the § 707(b)(3) totality of circumstances analysis).

56. Even though the IRS Local Standards do not apportion separate amounts between "housing" and "utilities" expenses, the Court will use the breakdown provided by the UST's website. In this manner, the focus of the argument can remain on the Debtors' rental expenses, without separate regard to their non-mortgage expenses. Both parties stipulated that the Debtors' claimed utilities expenses are within the $331 allowed by the figures provided on the UST's site.

57. The Trustee also argues that the Debtors have impermissibly claimed additional hous-

ing allowances on Line 21 of Form B22A. The thrust of the Trustee's argument is that this line is included to allow debtors to dispute the breakdown provided by the UST's website of the $1,084 figure into two separate components of $753 for mortgage and $331 for non-mortgage expenses, but that debtors are not allowed to claim excess amounts on this line. In other words, if a debtor paid $1,000 in mortgage payments, but had no utility costs, they would be able to use Line 21 to request an adjustment to reflect the higher mortgage payment, but could under no circumstances request more than the $1,084 allowed by the IRS standards. The Court declines to address this issue.

58. *Circuit City Stores v. Adams*, 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (quoting 2A N. Singer, Sutherland on

statute specifies two types of special circumstances that qualify as special circumstances, any other claimed expense must arise out of circumstances of the same nature. However, this canon, like all others, is not conclusive.[59] It should not limit the meaning of a given provision if doing so would be contrary to the statute's true intent.[60]

Applying this principle of statutory construction does not necessarily support the Trustee's position. The two examples, a call to duty in the Armed Forces and a serious medical condition, do not necessarily connote some sort of catastrophe.[61] They could as easily be characterized as "uncommon" circumstances.

Some courts have construed the word "special" to also mean "circumstances beyond the control of the debtor."[62] Another court has rejected this interpretation, noting that Congress inserted the phrase "circumstances beyond the control of the debtor" into §§ 362(n)(2)(B), 521(e)(2)(C), and 1308(b)(2) when it adopted BAPCPA, but did not do so here.[63] Furthermore, a serious medical condition resulting from a

self-inflicted injury, or a call to active duty following voluntary enlistment, would fit the statute's requirements, but would not arise from circumstances beyond the debtor's control.[64]

A few courts have attempted to define the criteria necessary to establish special circumstances in regard to either an increased housing or car operating allowance. In *In re Starkey*, the court refused to find special circumstances in the case of a family of seven, living in the suburbs in Washington D.C., who paid $3,300 in monthly rent, instead of the applicable Local Standard amount of $1,951.[65] The debtors claimed that the high cost of living in Washington, D.C. was itself a special circumstance. Granting the trustee's motion to dismiss, the court noted that "[h]ousing is expensive in the suburbs of the District of Columbia. That is not something unique to these Debtors. It is a fact of life faced by everyone who lives in that area...."[66] Thus, to prove the circumstances are "special," they must be not common to most debtors in the same locale.

---

Statutes and Statutory Construction § 47.17 (1991)).

**59.** *Id.* at 115, 121 S.Ct. 1302.

**60.** *NISH, RCI, Inc. v. Rumsfeld,* 348 F.3d 1263, 1268 (10th Cir.2003).

**61.** The legislative history indicates that the examples were added to clarify that these individuals would be exempt from the effects of means testing. They were added to the provision in 2005 by an amendment proposed by Senator Jeff Sessions of Alabama, who stated in part: "I believe ... that we can ... make sure that soldiers, certain persons with medical conditions, and veterans with low income can qualify under the safe harbor of the bill. I am offering an amendment which clarifies that these individuals who may fall under the special circumstances provisions of the bill are explicitly allowed to be covered...." There is nothing further in the de-

bate over the amendment to suggest that Congress otherwise intended these examples to serve as a benchmark for defining "special circumstances." *In re Delbecq,* 368 B.R. 754, 758–59 (Bankr.S.D.Ind.2007).

**62.** *See In re Tuss,* 360 B.R. 684, 701 (Bankr. D.Mont. Jan.5, 2007) ("Section 707(b)(2)(B)'s 'special circumstances' contemplates circumstances beyond a debtor's reasonable control ...."); *see also In re Sparks,* 360 B.R. 224, 230 (Bankr.E.D.Tex. Oct.18, 2006) (same).

**63.** *In re Graham,* 363 B.R. 844, 850 (Bankr. S.D.Ohio Mar.6, 2007).

**64.** *Id.* at 851 n. 3.

**65.** *In re Starkey,* 2007 Bankr.Lexis 155 (Bankr.D.Neb. January 25, 2007).

**66.** *Id.* at *6.

And there must be no reasonable alternative. In *In re Tranmer*, the debtors commuted 130 miles to work each day, and listed vehicle operating costs of $180 in excess of the Local Standards.[67] Denying confirmation of their Chapter 13 plan, the court noted that special circumstances did not include the "debtor's desire to remain living wherever they choose, even when their place of employment changes or requires a long commute."[68] The court held that, in failing to explain why they could not relocate, they had failed to show that there were no reasonable alternatives.[69]

In the case most similar to our facts, the *Delunas* court refused to find special circumstances.[70] The five-member family lived in a four-bedroom home in an upscale suburb of St. Louis. The debtors argued that they needed to live in that home so that their children could travel by public transportation to their schools. Mrs. Delunas also claimed that her daughter had been diagnosed with clinical depression and that, in her opinion, a move to a smaller home would potentially worsen her daughter's condition. The court found these facts alone insufficient to justify an additional $813 for monthly housing. The court noted that the debtors had failed to show that "complying with the IRS Standard completely 'prices out' the Debtors from living in the area where their children would receive free bussing to their current schools."[71] Moreover, the court found that the debtors had failed to establish proof that the daughter's condition would worsen if they were forced to move

to a different area. The *Delunas* court was unwilling to accept Mrs. Delunas' opinion, without corroborating medical testimony.

In this case, the only evidence presented established that the Debtors conducted a thorough search for suitable housing. Housing for less than $750 a month was available, but in a potentially unsafe area for their child. Suitable housing was available in the range of $900 per month, but it would require them to move away from the area of their child's school, and his classmates, jeopardizing the progress they have made in his emotional and social development. Even if they had secured housing for $900 per month, adding the utilities to this amount would have nevertheless exceeded the Local Standards. And if they had relocated to El Paso County, housing might be less expensive, but they would have added expenses for child care costs due to the loss of extended family child care available to them only in Pueblo County. Certainly a move would uproot their son from his school and classmates.

The Court found Mrs. Scarafiotti's testimony credible as to her son's special needs and not contrived to allow these Debtors to continue to enjoy a more affluent lifestyle. The Trustee did not object to the Debtor's testimony regarding their son's psychological needs. He presented no evidence of his own to cast doubt on the special mental and emotional problems of their son or that suitable housing is available within the amount of the standard allowance.

---

67. *In re Tranmer*, 355 B.R. 234, 238 (Bankr. D.Mont.2006).

68. *Id.* at 251.

69. *But see In re Batzkiel*, 349 B.R. at 586 (debtors who commuted long distances to work and suffered frequent deer collisions en route could claim excess vehicle operating costs as special circumstances).

70. *In re Delunas*, 2007 WL 737763, 2007 Bankr.Lexis 803 (Bankr.E.D.Mo. Mar. 6, 2007).

71. 2007 WL 737763, at *2, 2007 Bankr.Lexis 803, at *8.

While he argued that there might be less expensive housing available in El Paso County, he offered no actual evidence to substantiate this.

The present case highlights another difficulty in applying the statute. Often times the difficulty lies not in determining what factors to apply, but in determining whether the evidence offered is sufficient to satisfy the standard. Clearly, the burden of proof in establishing special circumstances rests with the Debtors. The Debtors here offered testimony regarding a special medical need and that they could not find any reasonable alternative for housing to meet this need. They did not provide any expert testimony or documentation to support either their son's medical condition, or on the housing market. But the Trustee offered no evidence to rebut the Debtor's testimony. Despite no contradictory evidence, the *Delunas* court was unwilling to accept the debtor's testimony without further evidence as to both the special medical need and the lack of a reasonable alternative housing option.[72]

Whether expert testimony or documentation of a medical condition is required to establish "special circumstances" appears to be a question of first impression in this jurisdiction. In the context of determining "undue hardship" in a student loan dischargeability case, the Tenth Circuit has not required separate documentation or expert testimony to establish a debtor's medical condition.[73] In other jurisdictions as well, courts have held that corroborating medical evidence is not required when debtors are "unable to afford expert testimony or documentation imposes an unnecessary and undue burden...."[74]

Certainly a debtor asserting special circumstances would be well-advised to offer at least documentary evidence establishing a medical condition, whether or not the trustee might block its introduction as hearsay. But absent clear Tenth Circuit precedent to the contrary, this Court is unwilling to impose a burden of proof that requires debtors to introduce expert testimony to prove their special circumstances, as to either medical conditions or no reasonable housing alternative.

Moreover, the statute requires that the Debtors show no "reasonable" alternative to their situation, not that there are no possible alternatives. The Court is satisfied that these Debtors have itemized and documented the additional expense, provided a detailed and credible explanation, and demonstrated that no reasonable alternative exists. Thus, special circumstances exist to justify this modest increase in the housing allowance.

## D. Retirement Plan Contributions and Loan Repayments

The Debtors assert that they are also entitled to deduct as expenses under the

---

**72.** 2007 WL 737763, at *2, 2007 Bankr.Lexis 803, at *9 ("Mrs. Delunas is not a physician and has a self-interest in conjecturing on the possible effects of her daughter's depression, and there was no qualified medical evidence offered in support of her belief.").

**73.** *Educational Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302 (10th Cir.2004).

**74.** *In re Barrett*, 337 B.R. 896, 903 (6th Cir. BAP 2006). *But see In re Swinney*, 266 B.R. 800, 805 (Bankr.N.D.Ohio 2001) (citations omitted).

[I]n line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the mental illness. Although such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position.

Means Test an amount representing the pre-bankruptcy deduction from their paychecks for their Thrift Savings Plans ("TSPs"). The combined amount of deductions for both Debtors was $510.56. Since contributions and repayments of withdrawals from retirement plans are not provided for under either the National or Local Standards, the Debtors were required to demonstrate that they are allowable as either Other Necessary Expenses or based on special circumstances.[75] According to the Trustee, they are not allowable under any provision of the statute.

The Other Necessary Expenses referenced in the statute represent categories of allowable expenses delineated in the IRM.[76] These categories include:

accounting and legal fees, charitable contributions, child care, court-ordered payments, dependent care, education, health care, involuntary deductions, life insurance, secured or legally perfected debts, unsecured debts, taxes, telephone services, student loans, internet or e-mail service, and repayment of loans made for payment of federal taxes.[77]

The Debtors have provided no evidence to support a finding that these expenses represent either involuntary deductions, or repayment of a loan which was used to pay federal taxes.

■ We recognize that, within the IRM, the list of Other Necessary Expenses is nonexclusive. And that the IRM expressly provides that "contributions to voluntary retirement plans are not a necessary expense."[78] But as discussed in relationship to the car ownership expense allowance, this Court will not graft all of the IRM and its interpretations into the statute, unless the statute expressly provides for this. Instead we rely on the language of the statute itself. It refers to "actual monthly expenses for the categories *specified* as Other Necessary Expenses...."[79] In keeping with the Plain Language View, this Court holds that the list of categories recognized by the statute are only those which have actually been "specified" by the IRS as Other Necessary Expenses. In other words, the list may be non-exclusive for purposes of IRS employees applying the IRM, but that it is an exclusive list for purposes of this statute. Thus, at present, retirement plan contributions and repayments do not qualify as an Other Necessary Expense.

■ The Debtors have also made no showing that these expenses qualify as a special circumstance. They have not shown a "special" need to repay that would not be true for every debtor. They have not established that there are no reasonable alternatives to repayment.

The Debtors have pointed out that § 1322(f) excludes from the definition of "disposable income" in § 1325 amounts de-

---

**75.** The Debtors have argued that the expense may be included as payment of secured debt under § 707(b)(2)(A)(iii). Only one court has recognized this treatment. *In re Thompson*, 350 B.R. 770 (Bankr.N.D.Ohio 2006). It has since been reversed on this holding. *Eisen v. Thompson*, 2007 WL 1880290, 2007 U.S. Dist. LEXIS 47383 (N.D.Ohio June 29, 2007). The *Eisen* court observed that retirement plan "loans" do not represent debts, let alone secured debts. 2007 WL 1880290, at *6, 2007 U.S. Dist. LEXIS 47383, at *18. The retirement plan administrator has no claim for repayment. *Id.* The consequence of failing to repay is that the withdrawal is treated as a taxable distribution. *In re Barraza*, 346 B.R. 724, 730 (Bankr.N.D.Tex.2006).

**76.** IRM § 5.15.10.

**77.** *Id.*

**78.** IRM § 5.15.1.23.

**79.** 11 U.S.C. § 707(b)(2)(A)(ii) (emphasis added).

ducted from an employee's paycheck for a retirement plan contribution or repayment of a withdrawal. Since the intention behind the Means Test is to identify those debtors who have the ability to repay a portion of their debts in Chapter 13, and in Chapter 13 a debtor could shield this amount from his creditors, it only makes sense to recognize the deduction under § 707(b). But while Congress provided for this deduction in § 1322(f), it did not include it in § 707(b). We are bound to enforce the statute as it is written. Thus, this Court finds no provision in the Means Test that would allow these Debtors to deduct the expenses associated with their retirement plans. But despite the disallowance of the retirement plan deductions, the Court's allowance of the other additional expense amounts brings the Debtors' monthly income below the level necessary to allow them to proceed in Chapter 7.

### E. Bad Faith and Other Grounds for Abuse under § 707(b)(3)

Even when the debtor rebuts the presumption of abuse or it does not arise under the Means Test, as in this case, § 707(b)(3) requires the Court to consider whether the granting of relief under Chapter 7 would nevertheless be an abuse of Chapter 7. These considerations include: "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." [80] While the Court has this obli-

gation, it can only make this determination based on the facts presented at trial. In this case, the Trustee did not raise § 707(b)(3) in his original motion, and the time limit for filing such a motion lapsed.[81] The burden was on the Trustee, as movant, to produce evidence tending to indicate an abuse of Chapter 7.[82] The Court conducted a full trial on this matter, giving the parties ample time. to present such arguments.

The only area where the Court could find a possible abuse is in the claimed vehicle ownership allowance. The Debtors now have $803 in disposable income for vehicles they have not yet decided to replace. It may be that they will not have to replace these vehicles for a long time and will therefore have $803 in disposable monthly income that could otherwise go to creditors under a Chapter 13 plan. However, given the high mileage on both cars and the substantial daily commute of these Debtors, they may very well have to replace these cars in the near future. In any event, the Court does not find this fact alone sufficient to warrant dismissal under § 707(b)(3).

### III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Trustee's Motion is DENIED.

---

80. *Id.* § 707(b)(2)(3).

81. *See* Fed. R. Bankr.P. 1017(e)(1).

82. *See In re Singletary,* 354 B.R. 455, 465 (Bankr.S.D.Tex.2006) ("[I]f the UST wishes to have the court consider facts external to the means test, it must make a motion under § 707(b)(3) based on the totality of the circumstances....").