**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 27 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:

GENEVA STEEL COMPANY,

    Debtor.

---

RICHARD M. ALLEN,

    Appellant,

v.

GENEVA STEEL COMPANY,

    Appellee.

No. 01-4085

---

**APPEAL FROM THE UNITED STATES BANKRUPTCY
APPELLATE PANEL FOR THE TENTH CIRCUIT
(BAP No. UT-00-070)
(Bankr. No. 99-21130   )**

---

Submitted on the briefs:

Richard M. Allen, pro se.

Ralph R. Mabey, Steven J. McCardell, Joseph M.R. Covey, of LeBoeuf, Lamb, Greene & MacRae, L.L.P., Salt Lake City, Utah, and Mark C. Ellenberg of Cadwalader, Wickersham & Taft, Washington, D.C., for Appellee.

Before **EBEL**, **KELLY**, and **BRISCOE**, Circuit Judges.

—————————————————

**EBEL**, Circuit Judge.

—————————————————

After a steel manufacturer sought bankruptcy protection, an investor charged that company fraud deceived him into retaining–rather than selling–his securities. For purposes of distribution priority, the Bankruptcy Code subordinates claims "arising from the purchase or sale" of a debtor's security. This language, courts have universally held, covers claims alleging fraud in the inducement to purchase or sell such a security. In this appeal, we are confronted with the question whether it also reaches claims alleging fraud in the retention of a security. We conclude that it does.[1]

## I. BACKGROUND

The undisputed facts are set out in the published decision of the Tenth Circuit Bankruptcy Appellate Panel. *See Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517 (10th Cir. BAP 2001). We restate only the relevant points here.

—————————————————

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

-2-

In 1999, Geneva Steel Company filed a petition in bankruptcy court seeking to reorganize under Chapter 11 of the Bankruptcy Code. The petition listed, among other debt, two public bond issues, the first issue coming due in 2001, the second in 2004. Under the terms of Geneva's proposed reorganization plan, all bondholders, regardless of the maturity date of their bonds, were grouped into a single class. Each member of the class would receive common stock in the reorganized company. Classes subordinate to the bondholders would receive nothing.

A trustee for each of the two bond issues submitted proofs of claim for the bondholders, including Richard Allen, who held notes due in 2001. Allen, on his own initiative, filed a $500,000 proof of claim, alleging that company fraud caused him to retain his debt securities. Accompanying his proof of claim was a letter from Allen to Geneva's chief executive officer. It stated that he had retained his notes, much to his detriment, because company officials remained silent in the face of growing financial difficulties.

Geneva moved to disallow Allen's claim as redundant to the claim filed on his behalf by the trustee. Allen objected, asserting that his claim rested on principles of fraud, not upon his ownership of the bonds. The bankruptcy court ruled that: (1) to the extent Allen's claim is based on his bonds, it duplicates the trustee's claim and is therefore disallowed; and (2) to the extent it is based on

fraud, it is subordinate to the claims of both bondholders and general goods and services creditors, since it is a claim, under section 510(b) of the Code, "for damages arising from the purchase or sale of [ ] a security."  11 U.S.C. § 510(b).

Geneva later amended its reorganization plan to create a new class of creditors:  those whose claims were subordinated pursuant to section 510 of the Code.  Claims in this category, which include only Allen's, receive no distributions.

The Tenth Circuit's Bankruptcy Appellate Panel affirmed the bankruptcy trial court's ruling, and Allen appeals.  The order subordinating his claim is a final order.  *See Adelman v. Fourth Nat'l Bank & Trust Co., N.A. (In re Durability, Inc.)* , 893 F.2d 264, 265-66 (10th Cir. 1990).  We exercise jurisdiction under 28 U.S.C. § 158(d).

## II.  HISTORY AND POLICY BEHIND SECTION 510(b)

A.      Early Treatment of Investor Claims in Bankruptcy

"In adopting section 510(b) Congress did not write on a clean slate." Kenneth B. Davis, Jr.,  *The Status of Defrauded Securityholders in Corporate Bankruptcy* , 1983 Duke L.J. 1, 4.  American and British courts have struggled for more than a century to referee battles between a bankrupt's creditors and its defrauded investors.  *Id.*  Early cases in both countries tended to side with the creditors, supported by the theory that a company's capital reserves represented

a "'trust fund' for payment of corporate debts." *Id*. at 5. By the early 1900s, courts began questioning the "trust fund" theory in favor of one that focused more narrowly on creditor reliance. Under this view, only creditors who could show actual reliance on a particular shareholder contribution warranted a superior claim to the capital invested by that shareholder. *Id.* at 5-6. By the 1930s, American courts routinely allowed investors to rescind their equity purchases, allowing investors not only to litigate their fraud claims but arming them, as well, with various procedural devices to ensure that creditors could not move ahead in the distribution line. *Id.* at 6-7.

B.    The *Oppenheimer* Decision and Its Criticism

In 1937, the United States Supreme Court put its weight behind the rule allowing investor participation on a par with general creditors. Called upon to review the liquidation of a depression-era bank, which had fallen into receivership, the lower court had rejected a shareholder rescission claim. It ruled that the shareholder could not receive any distribution until after all creditors were paid in full. The Supreme Court reversed, finding no statutory basis to support the appellate court's priority scheme; hence the Court refused to subordinate the shareholder's claim. *Oppenheimer v. Harriman Nat'l Bank & Trust Co.*, 301 U.S. 206, 215 (1937).

Although *Oppenheimer* was not, strictly speaking, a bankruptcy case, the high court subsequently declined to review two cases challenging whether its ruling applied in bankruptcy. *See* Robert J. Stark, *Reexamining The Subordination of Investor Fraud Claims in Bankruptcy: A Critical Study of In re Granite Partners, L.P.*, 72 Am. Bankr. L.J. 497, 503 (1998) (discussing *Oppenheimer* and the Court's refusal to decide whether its principle extended to bankruptcy cases). For their part, lower courts relied on *Oppenheimer* in continuing to treat defrauded investors in bankruptcy cases no differently from general creditors. *Id.* at 503-04 (discussing cases).

This tropism toward shareholder participation came to a dramatic halt in 1973 with the release of a report authored by the Commission on the Bankruptcy Laws, a blue ribbon panel created by Congress to recommend comprehensive changes to the Bankruptcy Code. *See* Davis, 1983 Duke L.J. at 10. The commission's report in turn embraced an influential article written by law professors John Slain and Homer Kripke. *See* John Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy–Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973).

Slain and Kripke criticized the favorable treatment that bankruptcy courts were extending to shareholder fraud claims. Their argument rested on the bargain

and reliance interests formed by creditors and equity-holders. They pointed out that allowing equity-holders to become effectively creditors–by treating these two classes as though they were one–gives investors the best of both worlds: a claim to the upside in the event the company prospers and participation with creditors if it fails. It also dilutes the capital reserves available to repay general creditors, who rely on investment equity for satisfaction of their claims. Giving shareholder claims the same priority as creditor claims, reasoned Slain and Kripke, eliminates this safety cushion. *Id.* at 286-91; *see also* Stark, 72 Am. Bankr. L.J. at 504 (discussing the Slain/Kripke position).

C.     The Enactment of Section 510(b)

In enacting the Bankruptcy Code of 1978, Congress found the Slain and Kripke position compelling. As the report accompanying the House version of the bill noted, Congress generally "adopt[ed] the Slain/Kripke position" tailoring section 510(b) in a manner that it considered "administratively more workable." H.R. Rep. No. 95-595, at 196 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6156. Its intent was to "subordinate[ ] in priority of distribution rescission claims to all claims that are senior to the claim or interest on which the rescission claims are based." *Id.*, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6156-57.

Effective November 1978, the Bankruptcy Reform Act inserted the subordination principle first articulated by Slain and Kripke into bankruptcy law. The language of the statute, altered only slightly since its enactment, reads:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

## III. INTERPRETING THE LANGUAGE OF THE STATUTE

Thus, if a claim (usually alleging some sort of securities-related fraud or similar injury) falls within the reach of the statute, it is treated on an inferior or equal basis with the security from which the claim arose. That is, a fraud claim arising from the purchase or sale of a security is treated not as a general unsecured claim but rather as a claim "below or equivalent to the rights afforded by the underlying security." *See* Stark, 72 Am. Bankr. L.J. at 497 (explaining operation of statute). (In 1984, Congress amended the statute to make clear that fraud claims springing from the purchase or sale of common stock are treated on the same level as common stock. All other claims are subordinated to their underlying security.) This adverse treatment carries serious implications for

investors, because a Chapter 11 reorganization plan, as is the case here, may deny distributions to entire classes of inferior security interests.      *Id.*

Joining three separate, dependent clauses, the statute subordinates three types of claims:  (1) an actual attempt to rescind a purchase or sale of a security issued by the debtor or one of its affiliates; (2) a claim for damages arising from a purchase or sale of such a security; and (3) a claim for reimbursement or contribution for a purchase or sale of such a security under section 502 of the Code.

The parties agree that Allen's bonds are "securities" within the meaning of section 510(b).  They further agree that his claim is neither an effort to rescind the purchase of his securities nor to seek reimbursement or contribution for their purchase.  They dispute only whether his proof of claim falls within the second category of subordinated items–whether it is a claim "for damages arising from the purchase or sale of [ ] a security."      *Id.*  To resolve this dispute, we must decide whether post-investment fraud that causes an investor to hold rather than sell his securities "arises" from the "purchase or sale" of those securities.

A.     Rules of Statutory Construction

We begin, as we do any instance of statutory construction, with the language of the statute.      *Yankee Atomic Elec. Co. v. N.M. & Ariz. Land Co.*     , 632 F.2d 855, 857 (10th Cir. 1980).  A statute clear and unambiguous on its face

must be interpreted according to its plain meaning. *Id.* An "[a]mbiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses." 2A Norman J. Singer, *Statutes and Statutory Construction*, § 45.02, at 11-12 (6th ed. 2000). If a statute is ambiguous, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history. *United States v. Simmonds*, 111 F.3d 737, 742 (10th Cir. 1997). Ambiguous text can also be decoded by knowing the purpose behind the statute. Singer, *Statutes and Statutory Construction*, § 45.09, at 49.

B.     The Language of Section 510(b) is Ambiguous

Although Allen and Geneva each claim that the language of section 510(b) is plain and unambiguous, they nonetheless arrive at starkly different interpretations. Arguing for a narrow construction, Allen says that the phrase "arising from the purchase or sale of such a security" refers back to the first clause of the statute, which speaks of rescinding the purchase or sale of the debtor's security. He insists that the "simplest and least strained" means of interpreting the statute is to require a direct nexus to what he calls the "original" purchase or sale of the security. Aplt's Br. at 16-17. By contrast, Geneva interprets the statute more broadly, pointing out that Allen's damages, assuming he was defrauded, can only be measured by establishing the price at which he could have sold Geneva's bonds had he been given accurate information.

Unavoidably, then, his damages "are causally connected" to his purchase and sale of the debt securities.  Appellee's Br. at 6.

We conclude, at least with respect to fraudulent retention claims like Allen's, that the language of section 510(b) is ambiguous.  In reaching this conclusion, we rely on the acute and thorough analysis provided by the bankruptcy court in *In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997).

A hedge fund seeking Chapter 11 protection, debtor Granite Partners, through its trustee, moved to subordinate various investors' fraud claims under section 510(b).  The investors charged that they were deceived into retaining their investments by the debtors' post-investment fraud.  They claimed that because their fraudulent retention claims alleged independent torts, the claims did not arise from the purchase or sale of the debtor's securities and therefore should be treated as general unsecured claims.  *Id.* at 334.

The bankruptcy court agreed with the investors' contention that the phrase "'arising from'" requires "some causal connection" between the initial security purchase or sale and the fraud.  *Id.* at 339.  But, suggested the court, that such a causal connection is required does little to shed light on the disputed statutory language, which lends itself to two different interpretations, both of them reasonable:

> A literal reading implies that the injury must flow from the actual purchase or sale; a broader reading suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event. Since the fraudulent maintenance claim cannot exist without the initial purchase, the purchase is a causal link.

*Id.* In the opinion of that court, such an interpretive condition defines ambiguity: "Reasonably well-informed persons," said the court, "could interpret section 510(b) in either [the broad or narrow] sense, and hence, the section is ambiguous." *Id.*

We agree. We cannot discern the scope of section 510(b) by examining only the text of the statute.

C.     Legislative History

The legislative history behind section 510(b) is helpful but not dispositive. On the one hand, as we mentioned above, it is clear that Congress embraced Professors Slain and Kripke's theory of risk allocation, namely, that general creditors assume a different type of risk with respect to the debtor's insolvency than do investors. And not only are general creditors unable to share in the potential benefits flowing from company success, they rely on the equity cushion created by the investors' capital contributions for payment. While Slain and Kripke focused primarily on shareholder rescission claims, their larger concerns sprang from what they termed the "disaffected stockholder's efforts to recapture

his investment from the corporation." Slain and Kripke, 48 N.Y.U. L. Rev. at 267, quoted *In re Granite Partners*, 208 B.R. at 339.

On the other hand, it is equally true that neither Congress nor Slain and Kripke discussed or even mentioned fraudulent retention claims. At least one commentator speculates, moreover, that the term "rescission claims," which appears in both the statute and its legislative history, reflects Congress's use of a "shorthand reference to both rescission and damage claims based on fraud in the inducement." Stark, 72 Am. Bankr. L.J. at 507. This commentator argues that the lack of any reference to fraud in the retention was not oversight: Congress, he says, simply held a narrow vision of the problem it sought to address when it drafted and voted on section 510(b), a vision that suggests it had no intent of subordinating fraudulent retention claims. *Id.* at 523. Were it otherwise, he adds, Congress could "easily" have drafted the statute "to subordinate all investor fraud claims, including fraud in the retention claims, if that was Congress's intent." *Id.* at 521.

We do not share the certitude by which this commentator views the legislative history. Like the text of the statute itself, we believe that it is indeterminate and indeed susceptible to opposing interpretations.

D.    Policy Objectives

It is here, in examining the statute's purposes and objectives within the larger context of bankruptcy law, that we find the most compelling reasons for subordinating Allen's retention claim.  Again we rest heavily on the reasoning set out in *Granite Partners* .  That court seized on what for investors is the unfortunate reality behind section 510(b):  its language, its legislative history, and most important, its embodied legislative policy choices, reflect strong congressional disapproval of investor fraud claims in bankruptcy.  With that principle firmly in mind,   *Granite Partners*   found no good reason to distinguish so-called fraudulent inducement claims from fraudulent retention claims.  Nor do we.  Put simply, "creditors stand ahead of the investors on the receiving line." *In re Granite Partners*   , 208 B.R. at 344.  [2]

Two separate but related policy reasons convinced the       *Granite Partners* court to treat retention claims no differently than inducement claims:

---

[2]    We are well aware that some commentators have criticized Congress's decision to disfavor investors in bankruptcy proceedings.  Professor Davis, for instance, believes a better rule would allow securities law claimants to participate on a par with other unsecured creditors.  He argues that such a rule "produces allocations that are better for public policy and fairer than the allocations produced by the subordination doctrine."  Davis, 1983 Duke L.J. at 4.  His trenchant analysis is not without force, but our task here is only to discern Congress's intent.  We do not "sit as a super-legislature to weigh the wisdom of legislation."   *Bensing v. United States*   , 551 F.2d 262, 265 (10th Cir. 1977).

First, from the creditors' point of view, it does not matter whether the investors initially buy or subsequently hold on to their investments as a result of fraud. In either case, the enterprise's balance sheet looks the same, and the creditors continue to rely on the equity cushion of the investment.

Second, a fraudulent retention claim involves a risk that only the investors should shoulder. In essence, the claim involves the wrongful manipulation of the information needed to make an investment decision. The [investors] charge that the debtors' [sic] wrongfully deprived them of the opportunity to profit from their investment (or minimize their losses) by supplying misinformation which affected their decision to sell. Just as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed.

*Id.* at 342.

We find the risk allocation argument persuasive in this case.[3] Allen's claim, at its essence, accuses Geneva of manipulating information concerning his investment. He acquired and held that investment with the belief that its value would increase, though he no doubt recognized that for any number of reasons it might not; indeed, he recognized that it might even lose value. In contrast, a mere creditor of Geneva could expect nothing more than to recoup the value of goods

---

[3]     The equity cushion argument may not apply in all cases. Take, for instance, an investor who purchases a security on the secondary market. Because it contributes no cash to the company, such a purchase does not bear on the company's capital reserve stock, nor can it comprise any part of the equity cushion on which a general creditor relies.

or services supplied to the company. Yet now, having watched his investment gamble turn sour, Allen would shift his losses to those same creditors. We think this effort clashes with the legislative policies that section 510(b) purports to advance.

Furthermore, we echo two additional concerns expressed by the *Granite Partners* court. First, Allen's position, if accepted, would produce an anomalous result. By holding his bonds as a result of the allegedly fraudulent conduct by Geneva, he says that he asserts a claim exempt from section 510(b). Yet were he to sell his bonds to a third party, a party duped by the same fraudulent conduct, that buyer would hold only a subordinated claim. *Id.* at 342 n.11. Second, Allen's position weakens a central feature of American bankruptcy law: the absolute priority rule. [4] As *Granite Partners* recognized, "When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule[ ] and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." *Id.* at 344.

---

[4] The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid. Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated. 11 U.S.C. § 1129(b)(2)(B)(ii); *Unruh v. Rushville State Bank*, 987 F.2d 1506, 1508 (10th Cir. 1993). The rule reflects the different degree to which each class assumes the risk of the debtor's insolvency. *See Granite Partners*, 208 B.R. at 337, 344.

## IV.  OTHER DECISIONS INTERPRETING SECTION 510(b)

A.    *In re Betacom*

A recent Ninth Circuit decision bolsters our decision to subordinate Allen's claim.  *See Am. Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.*), 240 F.3d 823 (9th Cir. 2001).  That case stemmed from the merger of two corporations.  For several convoluted reasons (including litigation), a group of shareholders from the acquired corporation never received delivery of the stock certificates for the acquiring corporation, stock promised to them as consideration for the merger.  *Id.* at 826.  The shareholders sued for breach of the merger agreement.  While their lawsuit was pending, the merged corporation filed a Chapter 11 bankruptcy petition.  The shareholders responded by repackaging their breach of contract action as a proof claim in the bankruptcy court. *Id.* at 827.

The debtor corporation sought to subordinate the investors' claims under section 510(b).  The bankruptcy court agreed, but the district court reversed, holding that an actual purchase or sale of a security is required to trigger the statute.  The district court reasoned that because the merger agreement had never been consummated (since the shares in the acquiring entity had never been delivered), there had been no purchase or sale of the debtor's securities; hence section 510(b) did not apply.    *Id.*

Rejecting the shareholders' efforts to avoid the reach of section 510(b), the Ninth Circuit reversed the district court. The appellate court concluded that the statute is not limited to fraud claims, i.e, that it reaches certain breach of contract claims; and it concluded as well that the statute is implicated, at least in some instances, without an actual purchase or sale of a security. *Id.* at 828, 830-31. The court relied heavily on the same concepts we employ to subordinate Allen's fraudulent retention claim. Citing Professors Slain and Kripke, as well as *Granite Partners*, it reasoned that shareholders bargained for substantially more risk than creditors, and that it would be unfair to dilute creditor claims when those creditors looked for repayment to the "equity cushion" that invested capital provides. *Id.* at 829-30. Consequently, it mattered little that the investors' claim arose from a breach of contract. What is important is the potential effect of the claim: it would dilute the capital available to repay general creditors. *Id; see also In re NAL Fin. Group, Inc.*, 237 B.R. 225, 232, 234 (Bankr. S.D. Fla. 1999) (agreeing with *Granite Partners* and subordinating post-investment claims pursuant to section 510(b), stating "there is no distinction between fraud committed during the purchase of securities and fraud . . . committed subsequent thereto that adversely affects one's ability to sell those securities").

B.    *In re Amarex*

Some courts, we recognize, have accepted Allen's narrow interpretation of section 510(b) and have held that the statute does not reach fraudulent retention claims.  Indeed one of them is from within this circuit:    *Ltd. Partners' Comm. of Amarex v. Official Trade Creditors' Comm. of Amarex, Inc.*    *(In re Amarex, Inc.)*  , 78 B.R. 605 (W.D. Okla. 1987).  That case, which arose from the failure of an oil and gas drilling partnership, involved post-investment fraud claims brought by hundreds of the limited partners against the general partner.    *Id.*  at 606.  Appearing in the bankruptcy proceedings, the limited partners charged, among other things, that the general partner wasted company assets, breached its fiduciary duties, and committed various acts of common law fraud.    *Id.*

The limited partners resisted subordination under section 510(b) by arguing that their claims were not related to the purchase or sale of a security.    *Id.*  at 608.  Disagreeing, the bankruptcy court ruled they would have no claims against the debtor but for their purchase of the limited partnership interests (which the bankruptcy code defines as securities).  The court also invoked the risk allocation rationale advanced by Professors Slain and Kripke.    *Id.*

The district court reversed.  After reviewing the statute's text and legislative history, it concluded, "Section 510(b) reveals a Congressional desire to shift to the shareholders the risk of fraud in the      *issuance*  and *sale* of the

-19-

security–no more." *Id.* at 609-10 (italics in original). It also accused the bankruptcy court of "ignor[ing] the clear language of section 510(b), its underlying policies and the purposes for which it was enacted." *Id.* at 610. And it emphasized that the statute "pertains only to claims based upon the alleged wrongful *issuance* and sale of the security and does not encompass claims based upon conduct by the issuer of the security which occurred after this event." *Id*. (emphasis added).

We respectfully decline to follow this reasoning, not least because it rests on a small but significant error in reading the statutory language. As the italicized terms above show, the district court read section 510(b) as limited to the "issuance and sale" of a debtor's security. In fact, the statute contains no such restriction; it bars claims arising from the "purchase or sale" of a security. The word "issuance" does not appear in the statutory language, and indeed, as courts have held, the statute is not limited to issuance-related claims. *See, e.g., In re Betacom*, 240 F.3d at 828-29; *In re Lenco, Inc.*, 116 B.R. 141, 144 (Bankr. E.D. Mo. 1990). We fear that the district court's constricted interpretation of section 510(b) flows from a mistaken reading of the statutory

text, a reading that erroneously substituted the more restrictive term "issuance" for the actual term "purchase."  [5]

## V. CONCLUSION

For more than two decades, courts have looked skeptically at any effort by an investor in a bankrupt entity to refashion himself or herself into a general creditor. [6]  This case is no different.  Allen accepted a different and higher risk of insolvency than did the general creditors.  In subordinating his claim, we do not suggest it lacks merit (though we note that Geneva denies committing any fraud); we instead refuse to treat it as a general unsecured claim.

The judgment of the United States Bankruptcy Appellate Panel is AFFIRMED.

---

[5]    We note that  *In re Amarex*  was followed by a later decision from the bankruptcy court of the Central District of California,  *In re Angeles Corp.*  , 177 B.R. 920, 927 (Bankr. C.D. Cal. 1995) (stating that  *In re Amarex*  provides "the correct interpretation of the 'arising from' language in 11 U.S.C. § 510(b)"). Having rejected the holding of  *In re Amarex*  , we similarly decline to follow *In re Angeles*  .

[6]    As the Second Circuit put it:  "When a corporation becomes bankrupt, the temptation to lay aside the garb of a shareholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion."  *Jezarian v. Raichle (In re Stirling Homex Corp.)* , 579 F.2d 206, 213 (2nd Cir. 1978) (quotation omitted).

-21-