**FILED**

**U.S. Bankruptcy Appellate Panel
of the Tenth Circuit**

**December 15, 2017**

**Blaine F. Bates
Clerk**

<u>NOT FOR PUBLICATION</u>*

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

|  |  |
|---|---|
| IN RE WASSON PROPERTIES, INC., | BAP No. WO-17-020 |
| Debtor. | |
| BARRY BURGESS and BARON BURGESS, | Bankr. No.15-14433<br><br>Chapter 7 |
| Appellants, | |
| v. | OPINION |
| KEVIN COFFEY, Chapter 7 Trustee, | |
| Appellee. | |

Appeal from the United States Bankruptcy Court

for the Western District of Oklahoma

Submitted on the briefs.**

---

\*      This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

\*\*      After examining the briefs and appellate record, the Court has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. Fed. R. Bankr. P. 8019(g). The case is therefore submitted without oral argument.

Before **KARLIN**, Chief Judge, **SOMERS**, and **JACOBVITZ**, Bankruptcy Judges.

---

**SOMERS**, Bankruptcy Judge.

---

Appellants Barry and Baron Burgess (the "Burgesses") were the high bidders at a prepetition auction sale of real property owned by the Debtor. After the auction, the Debtor received a higher offer and elected not to sell the property to the Burgesses. The Burgesses then sought specific performance in state court. Before the case was heard, the Debtor filed for relief under Chapter 7. The Burgesses filed a proof of claim for damages for breach of contract. The Trustee objected. After a trial, the bankruptcy court found no breach of contract and sustained the objection. The Burgesses appeal.

**BACKGROUND FACTS**

The facts relevant to this appeal begin with events occurring several years prior to the petition date.[1] In 2011, Gerald Kelley ("Kelley"), an Oklahoma licensed attorney, was appointed as the successor trustee of a family trust, the beneficiary of which was a developmentally disabled individual who was unable to support himself. The trust assets included three tracts of real property in Bryan County, Oklahoma (the "Property") that were collectively appraised at approximately $308,000.[2] After exhausting all available cash in the trust, Kelley determined it was necessary to sell the Property to continue to provide for the beneficiary's support. Because of potential title issues, Kelley created Wasson Properties, Inc. ("Wasson Properties") in January 2014, specifically for the

---

[1]     *Tr.* at 9-11, *in* Appellants' App. at 58-60.

[2]     *Trustee's Ex. 1*, *in* Appellants' App. at 128.

purpose of passing title to purchasers. Kelley subsequently transferred the Property from the trust to Wasson Properties. Kelley served as the president of Wasson Properties, and the trust held one hundred percent of its common stock.[3]

Kelley auctioned the Property on August 6, 2014.[4] Prior to the auction, Mr. Duggins, an attorney and relative of the beneficiary, created a pamphlet advertising the sale of the Property (the "Pamphlet").[5] The Pamphlet contained a rudimentary sketch of the Property's boundaries (in lieu of a formal property description, which appears not to have been available), provided Kelley's contact information, and referred to Kelley as the Trustee.[6] The Pamphlet also listed the following terms and conditions of the auction:

> The final high bid(s) must be irrevocable and subject only to the acceptance by the Trustee.
>
> The successful bidder(s) will be required to post a deposit of 10% of the purchase price and to sign a real estate Purchase Agreement at the time and the place of the sale.
>
> *The Trustee reserves the right to notify the high bidder(s) within 48 hours of the close of the auction and signing of the purchase Agreement(s), that the Trustee is going to purchase the high bid(s) for $100.00 each from the highest bidder or bidder(s).* However, the Trustee is well motivated and we do expect a sale(s) to be made as a result of the auction.[7]

The italicized sentence of the brochure is referred to as the "Bid Purchase Right." Kelley wanted the Bid Purchase Right as a condition to

---

[3]     *Tr.* at 7, 12, *in* Appellants' App. at 56, 61.

[4]     *Stipulation* at 2, *in* Appellants' App. at 31.

[5]     *Tr.* at 13-14, *in* Appellants' App. at 62-63.

[6]     *Trustee's Ex. 3* at 3, *in* Appellants' App. at 145.

[7]     *Id.* (emphasis added).

provide protection if the high bid was "not up to"[8] the value of the Property. Kelley also announced prior to the start of the auction "that all bids were subject to the right to notify the high bidder within 48 hours of the close of the [a]uction that their bids could be purchased for $100.00."[9]

The Burgesses placed the highest bid at the auction, agreeing to pay $185,000 for the Property.[10] Shortly after the auction, the Burgesses and Wasson Properties, by Gerald E. Kelley, President, executed a real estate purchase contract dated August 6, 2014 (the "Contract").[11] The Contract, drafted by Kelley,[12] included the following provisions:

> 1. PROPERTY: The undersigned as Buyer . . . hereby agrees to purchase the following real property situated in Bryan County, Oklahoma to wit:
>
>> See Exhibit "A" attached which contains a drawing of the parcel, the legal description of which will be provided by appropriate survey[.]
>
> . . . .
>
> 13. EFFECT: This Contract when executed by both Seller and Buyer shall be binding upon and inure to the benefit of Seller and Buyer, their heirs, legal representatives, successors and assigns. This Contract sets forth the complete understanding of Seller and Buyer and supersedes all previous negotiations, representations and agreements between them and their Agents. This Contract can only be amended, modified, or assigned by written agreement signed by both the Seller and Buyer.
>
> 14. ACCEPTANCE TIME: The foregoing offer is made subject to acceptance in writing hereon by the Seller, and the return of an executed copy to the undersigned Buyer on or before 5:00 p.m., August 8, 2014. If not so accepted, the said Earnest Money is to

---

[8] *Tr.* at 16-17, *in* Appellants' App. at 65-66.

[9] *Stipulation* at 2, *in* Appellants' App. at 31.

[10] *Id.*

[11] *Id.*

[12] *Tr.* at 30, *in* Appellants' App. at 79.

be returned to the Buyer.

. . . .

16. SELLER'S ACCEPTANCE: I, or we, accept the foregoing offer and agree to sell the above described real property on the terms and conditions herein stated and agree to pay Wiggins Auctioneers, LLC the compensation previously agreed upon in the Listing Agreement or other agreement of employment between them . . . .[13]

In addition to the Contract, the documents related to the transaction included: (1) a receipt of an earnest money deposit check in the amount of $18,500; (2) the Pamphlet; (3) a lead-based paint disclosure form; (4) a Limited Brokerage Service acknowledgment; and (5) Exhibit A, a drawing of the boundaries of the Property, which is a copy of the third page of Trustee's Exhibit 3, the auction brochure (collectively, "Trustee's Exhibit 5").[14] Kelley testified that the attachments to the Contract included all these documents, including the entire auction brochure.[15] Conversely, Barron Burgess testified that the Contract attachment was only one page of the brochure, a page with a drawing of the boundaries on which "Exhibit A" was typed.[16] Kelley also testified he informed the Burgesses at the time of the Contract signing that he had "48 hours after the close of the auction and the signing of the real estate purchase contract"[17] to exercise his right to

---

[13]    *Burgess Ex. 5* at 1-5, *in* Appellants' App. at 148-152.

[14]    *Trustee's Ex. 5*, *in* Appellants' App. at 155-170.

[15]    *Tr.* at 20-21, *in* Appellants' App. at 69-70; *Trustee's Ex. 5*, *in* Appellants' App. at 155-170.

[16]    *Tr.* at 43, *in* Appellants' App. at 92; *Burgess Ex. 5*, *in* Appellants' App. at 147-154. This is the only factual dispute. It is addressed in the Appellants' Reply Brief, but resolution of exactly what was attached to the Contract is not necessary for ruling on the merits of the appeal.

[17]    *Tr.* at 20, *in* Appellants' App. at 69.

purchase the bid.

After executing the Contract on behalf of Wasson Properties, Kelley learned of a third party interested in purchasing the Property for considerably more than the Burgesses' $185,000 bid.[18] Within the contemplated forty-eight hours, on August 8, 2014, Wasson Properties and James Eaton and Delphine Webb executed a real estate purchase contract (the "Eaton Webb Contract") for the purchase of the Property for $225,000.[19]

Upon receiving the earnest money deposit from Eaton and Webb and within forty-eight hours after the beginning of the purchase period, Kelley sent a fax to the Burgesses notifying them of his intent to exercise the Bid Purchase Right and purchase their bid for one hundred dollars.[20] Kelley also mailed the Burgesses both a letter notifying them of this intent and a check for one hundred dollars.[21] Kelley returned the Burgesses' $18,500 earnest money deposit to their attorney on August 20, 2014, after confirming the earnest money deposit check cleared his attorney trust account.[22]

Also on August 20, 2014, the Burgesses filed a petition in the District Court of Bryan County, Oklahoma for breach of contract (the "Petition"), naming Wasson Properties and Kelley as defendants.[23] The

---

[18]     *Stipulation* at 3, *in* Appellants' App. at 32.

[19]     *Id.; Trustee's Ex. 8*, *in* Appellants' App. at 171.

[20]     *Id.*; *Trustee's Ex. 9*, *in* Appellants' App. at 180-84.

[21]     *Trustee's Ex. 9* at 2-3, *in* Appellants' App. at 183-84.

[22]     *Stipulation* at 3, *in* Appellants' App. at 32; *Trustee's Ex. 13*, *in* Appellants' App. at 194-97.

[23]     *Burgess Ex. 14*, *in* Appellants' App. at 199-211.

Petition demanded specific performance as well as costs and attorney's fees. To avoid protracted litigation, Wasson Properties filed a case under Chapter 7 of the United States Bankruptcy Code[24] on November 17, 2015, staying the state court litigation.[25] Appellee Kevin Coffey is serving as Chapter 7 Trustee (the "Trustee"). The Burgesses filed a timely proof of claim for $185,000 on April 7, 2016 (the "Proof of Claim").[26] A legal description was attached, rather than the copy of a page of the brochure that the parties agreed was labeled Exhibit A.[27]

The Property was still owned by the Debtor at the time of filing,[28] so on December 7, 2016, the Trustee sought bankruptcy court approval of a §363 sale of the Property to W.E. Properties, LLC for $222,500, subject to higher and better offers.[29] The Burgesses objected to the proposed sale and placed a competing bid for the Property. Ultimately, the Burgesses made the final and high bid of $310,000, and the bankruptcy court approved the sale to the Burgesses on January 12, 2017.[30]

The Trustee objected to the Proof of Claim on April 13, 2017 (the

---

[24]    All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

[25]    *Tr.* at 29-30, *in* Appellants' App. at 78-79.

[26]    Proof of Claim 4-1, *in* Appellants' App. at 11-21.

[27]    *Id.*, *in* Appellants' App. at 21.

[28]    The record does not indicate what became of the Eaton Webb Contract postpetition, although it appears the Burgesses' litigation and the bankruptcy petition may have chilled the sale.

[29]    *Order Granting Trustee's Motion to Sell Real Property at Private Sale Free and Clear of Liens, Claims, and Other Encumbrances*, *in* Appellants' App. at 22.

[30]    *Id.* at 1-2, *in* Appellants' App. at 22-23.

"Objection"), stating the claim was invalid.[31] The Burgesses responded asserting they were damaged by Debtor's prepetition breach of contract and acknowledging the Proof of Claim required amendment "to reflect the fact that [they] were ultimately able to buy the [P]roperty."[32] However, the Burgesses never amended the Proof of Claim.

The bankruptcy court held an evidentiary hearing on the Objection on May 24, 2017,[33] and entered the *Order on Claim 4-1* (the "Claim Denial Order") the same day.[34] In the Claim Denial Order, the bankruptcy court sustained the Objection and disallowed the Proof of Claim in its entirety for the reasons stated on the record. On the record, the bankruptcy court referenced what it termed the "law of auctions," citing to *Money v. Fort Hays State University Endowment Association*[35] for the general rule that the owner of property sold at an auction has the right to enforce predetermined

---

[31]     *Trustee's Objection to Allowance of Proof of Claim Filed by Barry Don Burgess and  Baron Burgess – Claim No. 4-1*, *in* Appellants' App. at 25-27.

[32]     *Response to Trustee's Objection to Allowance of Proof of Claim Filed by Barry Don  Burgess and Baron Burgess – Claim No. 4-1* at 1, *in* Appellants' App. at 28.

[33]     During the hearing, Baron Burgess testified that the Proof of Claim for $185,000 represented the purchase price of the Property agreed to at the auction, and since the filing of the proof of claim, the Burgesses had purchased the Property so that the lost purchase price damages had been reduced to $125,000. *Tr.* at 57-58, *in* Appellants' App. at 106-07. The bankruptcy court precluded testimony about additional possible losses because the Burgesses had failed to amend their claim prior to trial. *Tr.* at 56, *in* Appellants' App. at 105. The amount of the Burgesses' claim is not an issue on appeal.

[34]     Claim Denial Order, *in* Appellants' App. at 48-49.

[35]     64 P.3d 458, 462 (Kan. Ct. App. 2003) ("The general rule regarding terms and conditions of sale is that the owner of property sold at auction 'has the right to prescribe, within reasonable limits, the manner, conditions, and terms of sale. Usually the auctioneer, at the time and place appointed for the auction, announces these terms and conditions which, when so announced, are generally deemed to supersede all others and to bind the purchaser' . . .7 Am. Jur. 2d *Auctions and Auctioneers* § 17, p. 372.").

conditions, which are binding on the purchaser even though not stated in a post-auction agreement for warranty deed.[36] Relying on *Money*, the bankruptcy court concluded the Bid Purchase Right was a condition, announced prior to the auction, which attached to the sale of the Property.[37] The bankruptcy court noted that Exhibit A to the Contract stated the Property would "sell for the highest total bidder bids per the terms of the auction" and "the terms of the auction very clearly include the 48-hour buy-back period."[38]

Accordingly, the bankruptcy court concluded the auction was subject to the Bid Purchase Right, the right was timely and correctly exercised, and therefore there was no breach of the Contract to be redressed through the Proof of Claim. The bankruptcy court stated in part:

> The highest and best bidder, in this case the Burgesses, were fully aware of that condition . . . . A real estate contract was signed at the conclusion of the auction and the earnest money was paid. That began the 48 hours of the buy-back period. . . . [T]he real estate contract on its face did not make mention of the terms and conditions of the auction. Nevertheless, those terms and conditions take precedence and allow that 48-hour period to continue. . . .
>
> ***
>
> [T]he notice given by Kelley to the Burgesses was within the 48-hour buy-back time frame. . . . [The] cases dealing with auctions provide that the terms and conditions of the auctions trump a real estate contract signed subsequent to that when they are express conditions, which they were here in both the pamphlet that was mailed, published, and available the morning of the auction, as well as the terms and conditions expressed by Mr. Kelley by an announcement at the auction itself.
> [I]t was further discussed by the parties in some form or fashion . . . . I find [Kelley] to be more credible as to what was

---

[36]     *Tr.* at 71, *in* Appellants' App. at 120.

[37]     *Id.* at 72, *in* Appellants' App. at 121.

[38]     *Id.* at 71, *in* Appellants' App. at 120.

likely the conversation that took place after the sale, that the 48-hour buy-back would not commence until the signing of the real estate purchase contract. The parties were fully aware of that, the Burgesses wanted the 48-hour time period to begin to run, so they signed the contract.

That being said, the Court finds that there is no basis for a claim of the Burgesses because there was no breach of the contract, because the real estate purchase contract was subject to the term and condition of the auction, of the 48-hour buy-back period.[39]

In addition, having found that the Bid Purchase Right condition was binding on the Burgesses, the bankruptcy court stated there was no need to address the contract questions.[40]

The Burgesses appealed the Claim Denial Order.

## II.   JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit unless one of the parties elects to have the district court hear the appeal.[41] The Burgesses appeal an order denying a proof of claim, which is a final order of the bankruptcy court.[42] Neither the Burgesses nor the Trustee filed a valid election to have this appeal heard by the United States District Court for the Western District of Oklahoma; therefore this Court has jurisdiction to hear the appeal.

---

[39]     *Id.* at 74-76, *in* Appellants' App. at 123-25.

[40]     *Id.* at 76, *in* Appellants' App. at 125. The Trustee in his trial brief argued that even if the Burgesses had rights under the Contract on the date the petition was filed—i.e., if the contract was enforceable, their claim must nevertheless be disallowed because: (1) the sole remedy of the buyer under the Contract was for specific performance; and (2) the Contract had been rejected. *Trustee's Hearing Brief* at 6-7, *in* Appellants' App. at 39-40.

[41]     28 U.S.C. § 158(a)(1), (b)(1), & (c)(1); Rule 8005; 10th Cir. BAP L.R. 8005-1.

[42]     *In re Geneva Steel Co.*, 260 B.R. 517, 520 (10th Cir. BAP 2001) (citing *In re Garner*, 246 B.R. 617, 619 (9th Cir. BAP 2000)) ("An order on an objection to a claim is a final order for purposes of 28 U.S.C. § 158(a)(1)."), *aff'd*, 281 F.3d 1173 (10th Cir. 2002).

**III.   ISSUE AND SCOPE OF REVIEW**

The issue on appeal as stated by the Appellants is whether the bankruptcy court erred in disallowing the Proof of Claim, because there had been no pre-petition breach of the contract for sale of the Property.

The bankruptcy court relied on Oklahoma state law in concluding there was no breach of contract because the exercise of the Bid Purchase Right precluded the creation of a binding contract to sell the Property. A bankruptcy court's interpretation and application of state law is reviewed *de novo*.[43] However, legal determinations underlying the bankruptcy court's decision to disallow a proof of claim are reviewed *de novo*, while findings of fact are reviewed for clear error.[44]

**IV. DISCUSSION**

The bankruptcy court disallowed the Proof of Claim, determining under Oklahoma law the exercise of the Bid Purchase Right—the forty-eight hour buy out period that was stated to be a condition of the auction sale —precluded the formation of a contract to purchase the Property. Whether the bankruptcy court should be reversed requires the Court to determine if the bankruptcy court erred in construing the Contract as subject to the Bid Purchase Right.

The Burgesses assert "there is no support in Oklahoma law for the idea that a written contract that follows an auction with reserve is somehow exempt from the standard rules of contract interpretation."[45] They rely on the Oklahoma parole evidence rule, which states: "The execution of a contract in writing supersedes all

---

[43]     *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) (concluding "a court of appeals should review *de novo* [the trial] court's determination of state law.").

[44]     *In re Broadband Wireless Int'l. Corp.*, 295 B.R. 140, 143-44 (10th Cir. BAP 2003).

[45]     Appellants' Br. 7.

the oral negotiations or stipulations concerning the matter which preceded or accompanied the execution of the instrument."[46] The Burgesses argue that the Contract supercedes  the Bid Purchase Right because it contains an express acceptance of the Burgesses' high bid offer to purchase as stated in paragraph sixteen, omits any mention of the Bid Purchase Right, and contains an integration clause in paragraph thirteen.[47] For the following two reasons, the panel finds these arguments insufficient to require reversal.

First, the Burgesses' arguments fail to show error in the bankruptcy court's reliance on, and application of, Oklahoma law regarding reserve auction sales. That law is best understood against the backdrop of the general principles of auction sales. "There are generally three types of auctions: (I)[sic] with reserve; (ii) without reserve; and (iii) conditional."[48] "In an auction with reserve, the placing of the property for sale is an invitation for bids, not an offer to sell.

---

[46]     Appellants' Br.  6-7 (citing Okla. Stat. tit. 15 § 137 (2017)). The parole evidence rule is a part of the substantive law of Oklahoma. *Fulton v. L & N Consultants, Inc.*, 715 F.2d 1413, 1418 n.3 (10th Cir. 1982). Although this section of the Oklahoma statutes is titled "Writing excludes oral negotiations or stipulations" and operates as a parole evidence rule, the Appellants do not argue that the bankruptcy court erroneously admitted evidence concerning the auction terms and conditions.

[47]     The Burgesses also argue that the bankruptcy court failed to consider "that there are two separate entities involved in these negotiations:" the "Trustee" referred to in the auction brochure, and Watson Properties, Inc., identified as the Seller in the Contract and as the employer of the auctioneers in the Limited Brokerage Service document included in the Trustee's Exhibit 5. Appellant's Br. 7. But the Burgesses then fail to argue how this fact impacted the bankruptcy court decision or why this constitutes grounds for reversal, so we do not further address it.

[48]     *Young v. Hefton*, 173 P.3d 671, 676 (Kan. Ct. App. 2007) (citing Kan Stat. Ann. § 84-2-328, a section of article 2 of the Uniform Commercial Code, and finding that the rules for auction sales of goods are instructive as to auction sales of real property).

Accordingly, each bid constitutes an offer that may be accepted by the seller[,]"[49] through acceptance by the auctioneer on behalf of the seller, "typically by the fall of the hammer or other method that notifies the high bidder that the bid has been accepted."[50] "In an auction without reserve. . . , the placing of property for sale constitutes an offer to sell and each bid represents a conditional acceptance, subject to receipt of a higher bid."[51] "In a conditional auction, the seller reserves the right to accept or reject bids *after* the close of bidding."[52] In conditional auctions, "[t]he auctioneer is left without authority to accept for the seller."[53] "The key distinction between an 'auction with reserve' and a 'conditional auction' is that property can only be withdrawn *before* the close of bidding in the former, but it can be withdrawn *after* the close of bidding in the latter."[54]

Conditional auctions embody the principle that "[t]he seller has the right to establish any terms and conditions for the sale he wishes, and where the seller explicitly reserves the right to reject any bid made, the contract for sale is not formed until the seller actually accepts the bid."[55]

> The announcement of the terms for [a conditional] auction is not considered an offer by the seller, but merely a proposal. When so announced, these terms and conditions are generally deemed to supercede all others and to bind the purchaser even though he or she did not hear or understand the announcement, or was not present at the time of the announcement and such terms were not

---

[49]     *Id.*

[50]     *Id.* (citing 7 Am. Jur.2d *Auctions and Auctioneers* §§ 17, 20, 31 (2017)). *See* 7 Am. Jur.2d *Auctions and Auctioneers* § 34 (2017).

[51]     *Id.*

[52]     *Id.*

[53]     7 Am. Jur.2d *Auction and Auctioneers* § 34 (2017) (emphasis added).

[54]     *Id.*

[55]     *Cuba v. Hudson & Marshall, Inc.*, 445 S.E. 2d 386, 387 (1994).

brought to his or her actual attention, or did not sign the terms and conditions.[56]

While Oklahoma case law on auctions is limited, it has approved the principle of a conditional auction, although it labels such auctions "with reserve," rather than "conditional". In *East v. Brown*,[57] where the "sellers specifically reserved the right to accept or reject the high bid,"[58] the court, although labeling the auction as "with reserve," stated:

> While the general rule is that in a reserve auction, the seller may withdraw the property until the 'hammerfall,' an exception to that rule is where the seller specifically reserves the right to approve or reject the high bid at a later time. In such a case, the hammerfall signals only the end of bidding, rather than the consummation of the sale.[59]

In *Mabry v. Like*,[60] the terms of the auction authorized the sale of property by a trustee "to be offered with trustee's confirmation, the trustee's [sic] reserve the right to accept or reject the high bid."[61] The court found the issue to be whether the auction was with or without reserve, and based on its particular facts concluded "that the auction was with reserve and that when the sellers did not confirm the highest bid, no contract was formed."[62]

The panel agrees with the bankruptcy court's finding that the auction in this case was an auction with reservation of the right to accept or reject the highest bid, also known as a conditional auction. The brochure announcing the

---

[56]     7 Am. Jur.2d *Auctions and Auctioneers* § 17 (2017).

[57]     986 P.2d 523 (Okla. Civ. App. 1999).

[58]     *Id.* at 525.

[59]     *Id.* (citations omitted).

[60]     *Mabry v. Like*, 76 P.3d 96, 98 (Okla. Civ. App. 2003).

[61]     *Id.*

[62]     *Id.*

auction sale expressly stated, "The Trustee reserves the right to notify the high bidder(s) within 48 hours of the close of the auction and signing of the purchase Agreement(s), that the Trustee is going to purchase the high bid(s) for $100.00 each from the highest bidder or bidder(s)."[63] The Burgesses admitted that they received the brochure and discussed the conditions of the sale with Mr. Kelley. "Where [] the notice of sale contains an express reservation of the right to reject any and all bids received. . . , the reservation becomes a condition and term of the sale."[64]

The Debtor properly exercised its right to purchase the Burgesses' high bid. Shortly after the close of bidding, the Debtor and Burgesses signed the Contract, which was a purchase agreement under the nomenclature of the auction brochure. Debtor had forty-eight hours after the close of the auction *and* the signing of the Contract to purchase Burgesses' high bid for one hundred dollars. It did so by giving the Burgesses timely notice of the exercise of the Bid Purchase Right, sending the Burgesses a one hundred dollar check, and returning their $18,500 deposit.

Contrary to the Appellants' argument, the foregoing interpretation of the Contract is not in conflict with the Oklahoma parole evidence rule or the presence of the merger or integration clause in paragraph thirteen of the Contract. Under Oklahoma law, even if a written contract is unambiguous and a complete statement of the parties' agreement, a court may consider parole evidence to "prove a separate parole agreement which constitutes a condition precedent to the

---

[63]     *Trustee's Ex. 5* at 11, *in* Appellants' App. at 166.

[64]     7A C.J.S. *Auctions and Auctioneers* § 36 (2017).

taking effect of a written contract."[65] The presence of an integration or merger

clause does not preclude parole evidence to prove a condition precedent.[66] This

principle is consistent with the Restatement (Second ) of Contracts § 217 that

states: "Where the parties to a written agreement agree orally that performance of

the agreement is subject to the occurrence of a stated condition, the agreement is

not integrated with respect to the oral condition."[67]

As an illustration of the rule, the Restatement (Second) of Contracts further

provides the following example:

> A and B sign a written agreement for an exchange of real
> property and leave it with C, an attorney, on the oral
> understanding that it is not to take effect until each has consulted
> his wife and notifies C that he still wishes to close the exchange.
> There is no contract until each has notified C.[68]

Here, the conditions of the auction sale, of which the Burgesses admit they were

aware, constitute an oral agreement establishing the conditions precedent to the

effectiveness of the Contract, which memorialized the sale in accord with the

Burgesses' high bid. There was no enforceable contract for the purchase of the

Property unless the Debtor failed to give notice of purchase of the high bid

within forty-eight hours after the close of the auction and the execution of the

---

[65]     *Pray v. Kidd Williams Drilling Corp.*, 352 P.2d 380, 384 (Okla. 1960).

[66]     *Excalibur Auto. Corp. v. Robinson (In re Excalibur Auto. Corp.)*, 859 F.2d 454, 458 (7th Cir. 1988); 11 Williston on Contracts § 33:23 (4th ed. May 2017) ("[I]n most jurisdictions, while the presence of a merger clause is presumptive evidence of an integration, it will not necessarily prevent proof of . . . conditions precedent."); Restatement (Second) of Contracts § 210 cmt. b ( 2017) ("[A] writing cannot of itself prove is own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties"); *Id*. at § 217 cmt. b ("Even a merger clause in the writing, explicitly negating oral terms, does not control the question whether there is an integrated agreement or the scope of the writing.").

[67]     Restatement (Second) of Contracts § 217 (2017).

[68]     *Id*. at cmt. a, illus. 2.

Contract. Because Debtor timely gave such notice, there was no enforceable contract for sale of the Property to the Burgesses.

Second, even if the bankruptcy court erred when holding under the Oklahoma law of auction sales that failure to exercise the Bid Purchase Right was a condition to the effectiveness of the Contract, this Court would also affirm on contract construction principles. The Burgesses' argument that the Contract must be construed based upon its four corners— and without consideration of parole evidence regarding the terms of the auction sale, does not provide a basis for reversal.

The Burgesses rely on paragraphs thirteen and sixteen of the Contract when arguing that it did not include the forty-eight-hour buy back period. Paragraph thirteen is the integration or merger clause and paragraph sixteen is entitled "Seller's Acceptance." Paragraph sixteen states: "I, or we, accept the foregoing offer and agree to sell the above described real property on the terms and conditions herein stated."[69] In making this argument, however, the Burgesses ignore paragraph fourteen of the Contract. It states: "The forgoing offer is made subject to acceptance in writing thereon by the Seller, and the return of an executed copy to the undersigned Buyer on or before 5:00 P.M. on August 8, 2014."[69] The Seller's acceptance of the offer to purchase, stated in paragraph sixteen of the Contract, must be read in light of paragraph fourteen. When so read, an ambiguity is revealed: did execution of the Contract on August 6, 2014, standing alone, constitute acceptance of the bid?

Contrary to Appellants' argument, neither the Oklahoma parole evidence rule nor the merger clause found in paragraph thirteen of the Contract bar the bankruptcy

---

[69] *Burgess Ex. 5* at 5, *in* Appellants' App. at 152.

[69] *Id.* at 4, *in* Appellants' App. at 151.

court's use of parole evidence concerning the terms and conditions of the auction when construing these conflicting provisions. The Oklahoma parole evidence rule states: "The execution of a contract in writing . . . supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument."[70] The rule does not apply when the matter is interpretation of an ambiguous contract.

> In cases of this sort, it does not matter whether the parties' agreement is even in writing; an oral agreement containing an ambiguous word or phrase may be just as much in need of interpretation as a written agreement, and both integrated and nonintegrated agreements may be less than clear and require interpretation.[71]

In Oklahoma, the terms of an ambiguous contract may be explained, but not varied, modified, or contradicted, by parole evidence.[72]

The bankruptcy court properly allowed evidence (without objection) both about the contents of the entire auction brochure (not just Exhibit A attached to the Contract) and about the auction sale itself. The auction brochure stated, "The Trustee reserves the right to notify the high bidder(s) within 48 hours of the close of the auction and signing of the purchase Agreement(s), that the Trustee is going to purchase the high bid(s) for $100.00 each from the highest bidder or bidder(s)."[73] And Mr. Kelley testified that after the auction was concluded, he discussed the forty-eight hour buy-back period with the Burgesses and informed

---

[70]     Okla. Stat. tit. 15 § 137 (2017).

[71]     11 Williston on Contracts § 33:2 (4th ed. May 2017); *Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P. 2d 523, 529 (Okla. 1985) ("While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement.").

[72]     *Mercury*, 706 P. 2d at 529.

[73]     *Trustee's Ex. 5* at 11, *in* Appellants' App. at 166.

them that "the 48-hour period I have in which to buy back this bid, if I decide to do so, doesn't start until the contract is signed."[74]

Baron Burgess admitted that he and his father talked with Mr. Kelley regarding the forty-eight hour buy back period after the auction and did not confirm or refute Mr. Kelley's specific testimony on this issue, other than to state that Kelley told them "this was a done deal."[75] The bankruptcy court was allowed to consider the contents of the auction brochure, and that brochure, coupled with Mr. Kelley's testimony, which the court expressly found more credible than the testimony of Baron Burgess, supports its conclusion that the Trustee did not accept the Contract on the date it was signed on August 6, 2014. Rather paragraph fourteen extended the seller's deadline to accept the auction bid to "48 hours of the close of the auction *and* signing of the purchase Agreement(s)."[76] As a result, the bankruptcy court correctly determined that the Contract was subject to the Bid Purchase Right, and because the Debtor timely exercised that right, there was no enforceable contract for sale the breach of which could be the basis for a claim against the Debtor.

For these reasons, this Court rejects the Appellants' arguments that the bankruptcy court's decision should be reversed on the basis that the bankruptcy court failed to properly construe the Contract.[77] The decision that the Burgesses did not have an enforceable contract of sale is supported by both the principles of

---

[74]     *Tr.* at 20, *in* Appellants' App. at 69.

[75]     *Id.* at 46, *in* Appellants' App. at 95.

[76]     *Trustee's Ex. 3* at 3, *in* Appellants' App. at 145 (emphasis added).

[77]     Because the Court affirms the bankruptcy court both on the principles of auction sales and contract construction, it need not, and thus declines to, consider the Appellee's arguments that § 365 of the Bankruptcy Code provides alternative grounds to affirm the bankruptcy court.

auction sales and by the customary rules of contract construction. As a result, the Objection to the Proof of Claim was correctly sustained, and we affirm the Claim Denial Order.